IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01552-MEH

CYNTHIA MULLEN, and
DEBORAH JOHNSON,

    Plaintiffs,

v.

SOUTH DENVER REHABILITATION, LLC, d/b/a Orchard Park Health Care Center,
CLEAR CHOICE HEALTH CARE, LLC, and
SBK CAPITAL, LLC,

    Defendants.

---

# ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Before the Court is Plaintiffs' Motion for Preliminary Injunction against Defendant South Denver Rehabilitation, LLC [filed February 4, 2020; ECF 88]. The Court heard the matter on February 25, 2020, and the parties submitted closing briefs and additional evidence on March 2, 2020. For the following reasons, the Court will deny the motion.

## I.  Background

Plaintiffs initiated this action on June 28, 2018, then filed the operative First Amended Complaint on October 26, 2018, alleging that Defendants caused them injuries by violating Section 504 of the Rehabilitation Act ("Section 504"), the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), the Affordable Care Act ("ACA"), the Colorado Anti-Discrimination Act ("CADA"), and Colorado law prohibiting outrageous conduct. *See* ECF 24. Specifically, for

analysis of the present motion, Plaintiffs allege that Ms. Mullen is deaf, her primary language is American Sign Language ("ASL"), and for 129 days in 2016, Defendant Orchard Park Health Care Center ("Orchard Park") failed to provide proper auxiliary aids or services (*i.e.*, ASL interpreters) for effective communication between its health care providers and Ms. Mullen while she received treatment and therapy following the amputation of her right leg below the knee. The case proceeded through discovery and currently pending are the parties' cross motions for partial summary judgment. ECF 79, 80.

On February 4, 2020, Plaintiffs[1] filed the present motion seeking preliminary injunctive relief pursuant to Title III of the ADAAA asserting that, on January 21, 2020, Ms. Mullen underwent an emergency amputation of her big toe on her left foot, then had another surgical procedure to place a stent in her left leg, and she was not discharged until February 4, 2020. In the meantime, on January 29, 2020, Ms. Mullen's treating physician, Jeremy Christensen, M.D., recommended a variety of skilled nursing services for her treatment and recovery following discharge from the hospital. *See* ECF 88-1. Apparently, to comply with 42 C.F.R. § 409.30(b)(1), Ms. Mullen must be admitted to a skilled nursing facility within thirty days of discharge. She asserts that she wishes to return to Orchard Park but does not trust that the facility will accommodate her deafness, so she seeks a preliminary injunction from this Court requiring, among other things, that Orchard Park "provide certified ASL interpreters for all communications and interactions that occur . . . between Orchard Park employees and Ms. Mullen." Mot. 15, ECF 88.

---

[1] Although the motion is brought by "Plaintiffs," they argue that only Ms. Mullen will suffer irreparable harm if the injunction is not granted, and they seek relief only for Ms. Mullen.

2

Defendants object to Plaintiffs' request, arguing that Ms. Mullen fails to meet the elements necessary to justify the imposition of a preliminary injunction. Defendants argue primarily that, because Ms. Mullen had not sought admission to Orchard Park following her discharge from the hospital, she cannot demonstrate that any injury she may suffer is "certain," rather than merely hypothetical. Plaintiffs reply that Ms. Mullen "is actively engaging in the admissions process with Orchard Park," including informing Defendants of her desire to seek admission and providing a release of medical records to Defendants concerning the most recent amputation; Plaintiffs also assert that Dr. Christensen "will be contacting Orchard Park forthwith to further engage in the admissions process." Reply 2, ECF 101.

At the hearing on February 25, 2020, Plaintiffs argued not only that irreparable harm is presumed in this case due to the mandatory nature of the relief provided by Title III of the ADAAA, but also that Ms. Mullen has standing to seek injunctive relief as a "tester." Orchard Park countered that Ms. Mullen fails to meet any of the elements necessary to justify preliminary injunctive relief. The Court heard testimony from Ms. Mullen and Dr. Christensen, and Plaintiffs' expert witness, Roger Williams, began his testimony; however, the hearing could not be completed due to the ASL interpreters' other obligations, so the Court ordered that all remaining testimony be completed by deposition, and that the parties submit briefs summarizing their arguments on or before noon on March 2, 2020.[2] The parties complied, and the Court is now fully advised.

---

[2] This includes the email communication, documents, and filings received after noon on March 2, 2020.

## II. Legal Standards

A preliminary injunction serves to preserve the status quo pending a final determination of the case on the merits: "In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits." *Keirnan v. Utah Transit Auth.*, 339 F.3d 1217, 1220 (10th Cir. 2003).

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (quoting *Free the Nipple–Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019)). "To succeed on a typical preliminary-injunction motion, the moving party needs to prove four things: (1) that she's substantially likely to succeed on the merits, (2) that she'll suffer irreparable injury if the court denies the injunction; (3) that her threatened injury (without the injunction) outweighs the opposing party's under the injunction, and (4) that the injunction isn't adverse to the public interest." *Id.* (citation and internal quotation marks omitted).

"But courts disfavor some preliminary injunctions and so require more of the parties who request them." *Id.* (citation and internal quotation marks omitted). "Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trial"; "[i]nstead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Id.* "To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: she must make a strong showing that these tilt in her favor." *Id.* The burden is on the movant to establish her right

to the relief requested. *Penn v. San Juan Hosp., Inc.*, 528 F.2d 1181, 1185 (10th Cir. 1975).

**III.     Discussion**

No party disputes that Plaintiffs, who request the provision of ASL interpreters for all communications between them and employees at Orchard Park, seek a "mandatory" injunction that would "change the [alleged] status quo" at Orchard Park. *See* Hearing on Motion for Preliminary Injunction, February 25, 2020 ("Tr.") 14: 9-23, ECF 104. Thus, to obtain a preliminary injunction here, Plaintiffs face a heavy burden to show they are "substantially likely to succeed on the merits" and the "balance of harms" weighs in their favor. Here, however, because the issue of standing was raised by the parties, and the Court is under a continuing obligation to satisfy itself of its own jurisdiction (*see 1mage Software, Inc. v. Reynolds and Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006)), the Court will begin by determining whether Ms. Mullen has standing to seek the requested injunctive relief.

Standing is an essential component of the case-or-controversy requirement of Article III of the United States Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff has the burden of establishing standing in order to invoke the jurisdiction of the federal courts. *Id*. at 561. To establish Article III standing, a plaintiff must allege that (1) he or she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004); *see also Colorado Cross-Disability Coalition v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1210-11 (10th Cir.

2014) ("*Abercrombie*") ("in ADA Title III cases, a plaintiff must establish standing to pursue the claim by pleading facts supporting three elements: a plaintiff must suffer an 'injury in fact' that is actual or imminent; the injury must be fairly traceable to the challenged action of the defendant; and it must be likely that the injury will be redressed by the relief requested.") (citation omitted).

"The 'injury in fact' requirement is satisfied differently depending on whether the plaintiff seeks prospective or retrospective relief." *Tandy*, 380 F.3d at 1283 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983)). To seek prospective relief, a plaintiff must demonstrate she is "suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Id.* However, a simple claim for a future injury constitutes mere speculation or conjecture and does not warrant invocation of jurisdiction. *See O'Shea v. Littleton*, 414 U.S. 488, 497 (1974); *see also Lyons,* 461 U.S. at111 ("The speculative nature of [plaintiff's] claim of future injury requires a finding that this prerequisite of equitable relief has not been fulfilled.").

In their closing brief, Plaintiffs argue that Ms. Mullen suffers a continuing injury in that "Orchard Park's 2016 discrimination caused Ms. Mullen in January 2020 to disregard her doctor's recommendation to return to a Skilled Nursing Facility, which negatively impacts her health. Further, Ms. Mullen['s] continuing injury, i.e., deciding against her doctor's recommendation to her own detriment, is traceable to the challenged action of Orchard Park in 2016." ECF 107 at 3. But Plaintiffs cite, and the Court has found, no evidence that Ms. Mullen has experienced a "negative impact" to her health by discharging directly home, rather than to a skilled nursing facility. While Dr. Christensen testified that "we need to keep a close eye on Ms. Mullen secondary to the diabetes" (Tr. 45: 15-18), her health is "tenuous" because "[d]iabetes can may treatments very difficult" (*id.*

6

46: 1-5), she needs "close follow-up with vascular surgery" (id. 47: 20-25), she "would benefit from close monitoring of her wound" (id. 48: 21-24), and she needs "help as far as rehab, occupational therapy, physical therapy, simple things like transfers, diabetic education . . ." (*id.* 49: 3-6), the doctor did not attest that Ms. Mullen's health was negatively impacted by discharging home rather than transferring to a nursing facility. In fact, Dr. Christensen's testimony reflects that he has seen her at least once after she discharged from the hospital (Tr. 49: 12-14), she will typically "follow up with him or the wound care center on a once-a-week basis" (id. 60: 14-15), and he has "had conversations" with her since her discharge (*id.* 50: 6-12), but he mentioned nothing about any detriment or negative health impacts Ms. Mullen has suffered due to going home rather than to a skilled nursing facility.

Plaintiffs also argue that Ms. Mullen is under "an immediate threat of injury in the future," contending her testimony "establishes that she intends to return to Orchard Park if the Court [o]rdered the requested injunctive relief." Unfortunately, this contention belies its premise; the Supreme Court has instructed that allegations of a future injury require "sufficient immediacy and reality . . . to warrant invocation of the jurisdiction of the district court." *Littleton*, 414 U.S. at 497. Plaintiffs assert Ms. Mullen will return to the facility *if* the Court grants their motion; logically, then, if she does not return or determines to go to another facility, she suffers no injury. By their assertion, Plaintiffs fail to demonstrate Ms. Mullen has suffered a concrete, imminent injury.

At the hearing, Plaintiffs cited *Tandy* for support of their position that Ms. Mullen has standing as a "tester" to seek preliminary injunctive relief. Tr. 10: 18-22. A "tester's sole purpose [is] . . . to determine whether defendant engaged in unlawful practices." *Tandy*, 380 F.3d at 1285.

7

However, while *Tandy* holds that "testers have standing to sue under Title II[3] of the ADA," the Tenth Circuit addressed a district court's order granting (in part) summary judgment in that case, not an order on preliminary injunctive relief. Further, it was not until the Tenth Circuit's 2014 opinion in *Abercrombie* that it held testers may have standing to sue under **Title III** of the ADA. 765 F.3d at 1211.

In *Abercrombie*, the Tenth Circuit also addressed an order granting summary judgment (for the plaintiff) and found that "anyone who has suffered an invasion of the legal interest protected by Title III may have standing, regardless of his or her motivation in encountering that invasion. However . . . a tester must demonstrate that she has indeed suffered a cognizable injury in fact that will be redressed by the relief sought." *Id.* As with a non-tester, "[w]hen prospective relief—such as an injunction—is sought, 'the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future.'" *Id.* (quoting *Tandy*, 380 F.3d at 1283). With respect to the "real and immediate threat" requirement, the court emphasized the difference between a plaintiff who plans to test a public accommodation several times each year and one who "merely expresse[s] a desire to someday visit" a public accommodation. *Id.* The court concluded that the plaintiff tester, who "averred that she 'intend[s] to . . . return to'" the public accommodation "at least six times per year," demonstrated "a concrete, present plan to return" to the public accommodation "several times—at least six—each year, including the year in which [plaintiff] made that statement." *Id.* at 1211-12.

---

[3]Title II of the ADA prohibits discrimination by the government in its public services, programs, and activities, while Title III governs discrimination by places of public accommodation. *Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004).

Here, the Court finds Ms. Mullen has failed to demonstrate she has standing as a "tester" under Title III of the ADA. Ms. Mullen does not argue that she is "suffering a continuing injury" as a tester; thus, the Court's inquiry is focused on whether she is "under a real and immediate threat of being injured in the future." While Ms. Mullen testified that she intends to return to Orchard Park to "test" whether the facility will provide her an ASL interpreter, she only responded in the affirmative to her counsel's direct question asking whether that was her intention. Tr. 40: 9-12 ("Q: And you think you are here today to talk about your intent to return to Orchard Park to test the facility, right? A: Yes, I want to go see if they will have an interpreter there."). She did not attest that she plans to visit or contact the facility again nor did she assert whether she has ever served as a tester before. *See, e.g., Civil Rights Educ. & Enf't Ctr. v. Sage Hosp. Res. LLC*, 222 F. Supp. 3d 934, 955 (D. Colo. 2016). Notably, Plaintiffs do not mention their "tester" theory of standing in their closing briefs. *See* ECF 105, 107. The Court is not convinced Ms. Mullen has standing as a tester in this matter.

Moreover, the Court is not persuaded by Ms. Mullen's testimony that, although her Medicare plan will not pay for "skilled rehabilitation" at Orchard Park (Tr. 9: 16-21), she still plans to go there for treatment, despite the fact that she has been admitted to another facility that will pay for all necessary services and that the services at Orchard Park might cost her (a Medicaid recipient) thousands of dollars, which she would "figure out" how to pay. *Id.* 34: 5-23.[4] When asked twice

---

[4] The Court believes that line 8 on page 34 was incorrectly transcribed; based on the Court's memory and the context of the questions and answers that followed, Ms. Mullen attested, "I would figure out how to pay it." *See also* Tr. 40: 17-18 ("What I said before is that I will figure out how to pay.").

9

whether her doctor told her he thought it was "weird" or "strange" that she wanted to return to Orchard Park, Ms. Mullen refused to answer the question directly and responded only that "Dr. Christensen told me I need to go to rehab to get the best care for my amputated toe." *Id.* 38: 16 – 39: 10. Dr. Christensen testified that, in his experience of practicing medicine, he could not recall a patient who "[chose] a facility where they would have to pay thousands of dollars out of pocket over one where everything would be covered." Id. 55: 1-17. Although the Court recognizes there may be difficulties in communicating between people speaking different languages, two ASL interpreters were on hand at the hearing to translate for Ms. Mullen, and neither she nor her attorneys commented or complained that Ms. Mullen did not understand the questions.[5] In light of these considerations, the Court finds Ms. Mullen's testimony on this matter to be dubious and self-serving.

In addition, the Court finds it is merely speculative that the requested relief will redress Ms. Mullen's injury. *See Tandy*, 380 F.3d at 1283 (to establish standing for prospective relief, "[t]he threatened injury must be 'certainly impending' and not merely speculative."). No party disputes that admission into Orchard Park for treatment is governed by state and federal regulations and requires consideration of certain non-discriminatory factors, such as bed space (Declaration of TJ Sylvain, February 13, 2020, ¶ 3), whether there is an outstanding balance from previous admission(s) (*id.* ¶ 5), and whether the facility can provide the service(s) requested. Thus, this case is unlike *Tandy* or *Abercrombie* where there was no indication that the plaintiffs encountered non-

---

[5]If the attorneys believed Ms. Mullen did not understand a question, they were able to cure the difficulty at the hearing. *See* Tr. 27: 3-25, 28: 1-8; 40: 19-25, 41: 1-25, 42: 1-5.

discriminatory factors that might prohibit their access to the public service or accommodation.

Ms. Mullen has submitted a copy of her February 21, 2020 "application" for admission to Orchard Park. The application consists of a one-page letter containing her diagnosis, requested therapies ("PT/OT"), emergency contact, referral physician information, and payment source. ECF 105-6. Attached to the letter are Patient Authorization to Disclose Protected Health Information forms, executed by Ms. Mullen, for release of records by Parker Adventist Hospital and Porter Adventist Hospital during the periods in January and early February 2020 when she was hospitalized. *Id.* Dr. Christensen testified that he assisted Ms. Mullen with the application process by contacting representatives at three facilities, including Orchard Park, she had chosen—though "normally, this happens at the hospital so I had to do a little research to kind of find out who to speak with directly"—and sending them his order for therapy as well as "operative reports, discharge summaries, et cetera." Tr. 51: 15-24. The doctor opined that Ms. Mullen "meets the necessary qualification to return to a skilled nursing facility." *Id.* 53: 11-14.

Ms. Mullen learned just prior to the February 25 hearing that Orchard Park does not accept her insurance; she does not argue this conclusion is based on discrimination prohibited by the ADAAA. Thus, the ball is in Ms. Mullen's court; she testified that she would go to Orchard Park despite the costs, and Dr. Christensen testified that Ms. Mullen needs skilled nursing services now (and has needed them since February 4, 2020),[6] but there is no indication that Ms. Mullen has continued to pursue her application for admission to Orchard Park. If she is not communicating

---

[6] Dr. Christensen opined that Ms. Mullen "should have received skilled nursing care upon discharge from the hospital" and that he believed Ms. Mullen "went against [his] recommendation" when she discharged home. Tr. 54: 8-14.

11

and/or interacting with persons at Orchard Park, she is not suffering any injury. Accordingly, it is only speculative that Ms. Mullen's requests for relief—that Orchard Park refrain from communicating in English and provide certified ASL interpreters for all communications and interactions that occur between Orchard Park employees and Ms. Mullen—will redress claimed injuries by Orchard Park.

The Court concludes, for purposes of the present motion only, that the Plaintiffs have failed to demonstrate that Ms. Mullen has standing to bring her claim for preliminary injunctive relief against Orchard Park pursuant to Title III of the ADAAA.

## IV. Conclusion

Accordingly, the Plaintiffs' Motion for Preliminary Injunction Against Defendant South Denver Rehabilitation, LLC d/b/a Orchard Park [filed February 4, 2020; ECF 88] is **denied**.

Dated at Denver, Colorado this 3rd day of March, 2020.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge