IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01552-MEH

CYNTHIA MULLEN, and
DEBORAH JOHNSON,

      Plaintiffs,

v.

SOUTH DENVER REHABILITATION, LLC, d/b/a Orchard Park Health Care Center,
CLEAR CHOICE HEALTH CARE, LLC, and
SBK CAPITAL, LLC,

      Defendants.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court are Defendants' Motion for Partial Summary Judgment (ECF 79) and Plaintiffs' Partial Motion for Summary Judgment Against Defendant South Denver Rehabilitation, LLC ("Orchard Park") (ECF 80).  In this case, Plaintiffs have asserted claims under Section 504 of the Rehabilitation Act ("Rehab Act"), 29 U.S.C. § 794 *et seq*.; the Americans with Disabilities Act Amendment Act ("ADA"), 42 U.S.C. § 12181 *et seq*.; the Affordable Care Act ("ACA"), 42 U.S.C. § 18001 *et seq*.; the Colorado Anti-Discrimination Act ("CADA"), Colo. Rev. Stat. § 24-34-601 *et seq*.; and Colorado common law, for outrageous conduct.  Defendants seek dismissal of Plaintiffs' claims against Clear Choice Health Care, LLC ("CCHC") and SBK Capital, LLC ("SBK") and all claims alleged by Deborah Johnson ("Johnson").  Plaintiffs seek judgment in their favor on all claims alleged against Orchard Park.  For the following reasons, the Court will grant in part and deny in part Defendants' motion and deny Plaintiffs' motion.

**FINDINGS OF FACT**

With respect to each argument presented, the Court makes the following findings of fact viewed in the light most favorable to the non-moving party, recognizing that all parties in the case are both moving and nonmoving parties.  Unless otherwise cited, these facts are undisputed.

1.      Plaintiff Cynthia Mullen ("Mullen") is deaf.  Her speech is not intelligible, and she can only make inarticulate sounds to get someone's attention. She can sometimes read lips.

2.      Mullen's primary means, and preferred mode, of communication is American Sign Language ("ASL").  She learned ASL and reading in elementary school.

3.      Mullen took a typing class in high school and had Math and English homework she completed at home and turned in at school the following day.

4.      Mullen obtained driver's licenses in each state in which she has lived since the age of 16 (California, Oregon, and Colorado).  At the age of 15, Mullen was required to take both written and driving tests to get her permit and license.

5.      Mullen worked part time for the U.S. Postal Service until she became medically disabled by diabetes; she also worked at the State Hospital and at a fruit company in California.

6.      Mullen reads and handles her own mail, and reviews, disputes, and pays her own bills, including medical bills.  She has also leased apartments–in which she has lived on her own–and read, understood, and signed the leases.

7.      Mullen has taught ASL to hearing persons by writing a word, then showing the person the sign for that word, and by using a "basic book of signs."

8.      Mullen enjoys watching television and movies with closed captioning, coloring in coloring books, chatting on Facebook, and reviewing dating websites.

9.      Mullen goes shopping, grocery shopping, to social events, to restaurants, to casinos, out of town on weekends, to festivals, to visit her grandchildren and her son, and to exercise.

10.     Mullen is part of a women's social group that plays games, goes to restaurants, visits different people's houses, and has brunch and ice cream.  The other members of the women's social group are hearing, and the group meets two to three times a month.  Mullen communicates her attendance with the group via email.  She has taught some women in the group how to sign.

11.     Mullen likes to go to casinos in Blackhawk, Las Vegas, and Reno and has been playing Blackjack for many years.

12.     Multiple doctors for whom Mullen is a patient have arranged for an ASL interpreter to be present at their appointments with Mullen.

13.     Plaintiff Johnson, who is not disabled, has been Mullen's caregiver for approximately four years.

14.     Mullen and Johnson met online and were in a romantic relationship for approximately ten years, partly during which Mullen was a resident at Orchard Park.  They communicated in writing for approximately one to two months before they met in person.  Mullen traveled from Denver, Colorado to Las Vegas, Nevada for their first face-to-face meeting. When they met in person, they continued to communicate in writing.

15.     Currently, Mullen and Johnson are friends and roommates, and Johnson is Mullen's caregiver.  Mullen eventually taught Johnson ASL and, now, that is their primary form of communication.

16.     It took Johnson two to three months to learn from Mullen how to communicate the basics in ASL, and approximately six to nine months for Johnson to communicate with Mullen primarily

in ASL.  Johnson also took ASL classes.

17.     Johnson has attempted to provide interpretation for Mullen at several health care facilities when outside interpreters were not provided, although she is not certified as an ASL interpreter.

18.     When they are not together, Mullen and Johnson communicate through texts.  In addition, Johnson writes Mullen's appointments on Mullen's calendar and Mullen reads the appointments from the calendar.

19.     Johnson interprets for Mullen at the women's social group.  She has no special communication needs of her own.

20.     Johnson claims she was discriminated against as Mullen's companion.

21.     Defendant Orchard Park is a Georgia Limited Liability Company.

22.     Orchard Park leases and operates Orchard Park Health Care Center, which is open to the public Monday through Sunday, twenty-four hours per day, and is located at 6005 S. Holly Street in Centennial, Colorado.

23.     Orchard Park employs nurses, certified nursing assistants, occupational therapists, physical therapists, and administrative professionals, who make up more than fifteen individuals.

24.     Physicians come to Orchard Park and provide medical services.

25.     Orchard Park receives Medicare and Medicaid payments.

26.     Mullen was a resident at Orchard Park from June 26, 2016 through September 11, 2016, and September 13, 2016 through November 4, 2016.

27.     Mullen has heart disease, hypertension, and Type 2 Diabetes.  On June 13, 2016, as a complication of her conditions, Mullen underwent surgery to amputate her right leg below the knee.

28.     Phil Adair was the Marketing Director at Orchard Park and was the head of the admissions

4

office where he worked as a clinical liaison to potential residents in hospitals.  Adair had two meetings with Mullen at Parker Adventist Hospital, which occurred after Mullen's amputation and before Mullen was admitted to Orchard Park.

29.     During the first meeting between Adair and Mullen, Johnson was not present; thus, Adair and Mullen communicated in written English by using a pad of paper and pen Mullen had at her bedside.  Adair determined that he needed to have Johnson present and made arrangements to come back to meet with Mullen when Johnson could be present.

30.     Adair testified that one of the reasons he needed to have Johnson present at the second meeting was "to make sure Ms. Mullen[] could understand."

31.     Adair testified, "if [Johnson] was not available [for the meeting], if she was out of town or something, I would ask the hospital if they had interpreter services as well since the hospital's seeing the patient."

32.     Adair testified that he wanted Johnson present during his second meeting with Mullen "to make sure she understood . . . everything about Orchard Park and what I was doing and bringing her in if she wanted to select our facility, because that was her primary way of communicating, even though she could communicate in writing, just to make sure that all that was taking place." Deposition of Philip Adair, November 13, 2019 ("Adair Dep.") 52:10-16, ECF 80-5.

33.     At Adair's second meeting with Mullen, Johnson was present and interpreted for Mullen and Adair.  Mullen and Johnson requested that Johnson be allowed to stay at the facility with Mullen.

34.     Adair has the authority to admit a prospective patient to Orchard Park unless the prospective patient has a "red flag."  Prior to Mullen's admission to Orchard Park, Adair "red flagged" Mullen for her hearing loss, need for interpreter services, amputation, medications, prior visits to other

facilities, and the number of days she had left for Medicare, and informed Orchard Park's Administrator, Chris Tanner, and the Director of Nursing.

35.    Mullen was admitted to Orchard Park on June 26, 2016.  Johnson and the Plaintiffs' service dogs "spent pretty much every night" with Mullen at Orchard Park from June 26, 2016 through August 9, 2016.  Deposition of Deborah Johnson, August 15, 2019 ("Johnson Dep.") 79: 20-25, 80: 1-3.

36.    Throughout Mullen's residency, Orchard Park was to provide to her skilled nursing services, skilled rehabilitation services, physical therapy, and occupational therapy.

37.    Specifically, Mullen received treatment at Orchard Park for the following, which includes, but is not limited to: a below-the-knee amputation for which she received physical therapy, occupational therapy, and aquatic therapy; a non-healing surgical wound to her right leg from her below-the-knee amputation prior to her admission, including application of ace bandages, Kerlex, and dry gauze; weekly skin assessments; Diabetes Mellitus Type II; pre-existing issues including nerve pain and muscle spasms; pre-existing hypertension; digestive issues including nausea, diarrhea, gas, bloating, and constipation; nasal dryness; cellulitis on her left lower extremity; a left shin x-ray referral; right lower rib pain, for which she was referred for an x-ray of her chest; a fungal infection of her mouth; and a psychiatric evaluation for pain/narcotic dependency.

38.    Patients communicate with staff at Orchard Park on and off throughout a twenty-four-hour day, seven days per week.  Mullen was provided and wrote on a dry erase board to communicate with Orchard Park's staff; Orchard Park also provided a "communication board," but Mullen found it insulting to use because she can read and write.

39.    Johnson instructed certain staff to write things down for Mullen when Johnson was not there

6

to interpret.

40.     Orchard Park's medical records contain a document dated June 26, 2016 (the day of Mullen's admission) titled "education evaluation," which acknowledges that Mullen cannot hear, can read, has problems writing, and communicates in ASL.

41.     Mullen claims she was discriminated against when she resided at Orchard Park because interpretative services were not provided to her.

42.     On June 27, 2016, Occupational Therapist Mark Lyons wrote to Mullen, stating, "My name is Mark, Occupational Therapist. I'm planning to come see you 1pm this afternoon."  Mullen responded, "Can you get me interpreter w/ PT? 24/7 interpreter services want mark or illise [sic] or clarence."  Lyons responded, "I'll ask . . . [b]ut I don't know."

43.     In a handwritten note, dated June 27, 2016, between Mullen and her "guardian angel," Daphne Richards, Mullen states, "best to have interpreter here easy commucation [sic]. Have to hired [sic] interpreter agent Debbie is not interpreter. Not like misunderstand."  Richards responded, "I understand and will ask administrator."

44.     Physical Therapist Ann Takahashi-Elliot testified that when she first met Mullen and Johnson, which was two days after Mullen was admitted, "Ms. Johnson had told me that they would file a lawsuit if an interpreter was not provided."

45.     A grievance, dated June 29, 2016, filed by Richards on Mullen's behalf, stated that Mullen "needs ability to communicate with nurses for higher more complicated issues–concerned nursing not listening to her re: insulin and expiration date."  Grievance, ECF 80-15.

46.     Administrator Chris Tanner was assigned to take action on the June 29, 2016 grievance and, in response, he wrote, "[p]urchased white dry erase board for communication as well as reached out

to translation service."

47.     The June 29, 2016 grievance states that Mullen was notified of the resolution of the grievance on June 30, 2016, by a one-on-one discussion with her.

48.     On June 30, 2016, Care Navigator Emily Lynch emailed Tanner, stating, "[t]his is the link for the interpreting service I mentioned in the morning meeting . . . . It looks like they charge around $55/session. I don't know how you want to go about setting up services since therapy and MDS are the ones needing to coordinate their times."

49.     On June 30, 2016, 24 Hours Sign Language Services ("24 SLS") emailed Tanner stating that the company provides ASL interpreting services twenty-four hours per day, seven days per week.

50.     Twenty days later, on July 20, 2016, Tanner responded to 24 SLS stating, in pertinent part, "[w]e have a resident that is here needing interpreter services for a care conference, therapy sessions and when the physician comes to visit."

51.     On July 21, 2016, Tanner responded to an email from 24 SLS, which requested the dates and times interpreting services would be needed, stating, "[c]an we plan on 2-4 mon- fri? The therapy sessions last 60-75 min. The rest of the time can be used with nursing or when the physician comes if that works. Could we start mon?"

52.     On July 25, 2016, Orchard Park began providing Mullen with a qualified interpreter during the time slot that Tanner had scheduled, which was for two hours per day, Monday through Friday.

53.     From July 25, 2016 through September 11, 2016, Orchard Park provided to Mullen qualified interpreters two hours per day, Monday through Friday, with the following exceptions: on July 29, 2016, qualified interpreters were at Orchard Park for three hours; on August 10, 2016, no interpreter was provided; on August 15, 2016, no interpreter was provided; and on September 1, 2016, no

interpreter was provided.

54.     From September 13, 2016 through November 4, 2016, Orchard Park provided qualified interpreters two hours per day, Monday through Friday, with the following exceptions: on September 14, 2016, qualified interpreters were present at Orchard Park for 2.25 hours; on October 20, 2016, qualified interpreters were present at Orchard Park for 2.50 hours; on October 31, 2016, no interpreters were provided; and on November 4, 2016, no interpreters were provided.

55.     A Nurse Practitioner Progress Note-Narrative dated July 26, 2016 states in part, "[Mullen] reports that I should have been here earlier today. Said that they had someone that did the Sign Language and said that it would have been helpful to communicate with the doctor."

56.     A July 29, 2016 Progress Note states in part, "IDT team . . . met with Cynthia and interpreter to discuss her concerns about care issues. Cynthia stated that she feels that she is not being communicated with in her preferred language which is sign language."

57.     Orchard Park's Daily Treatment note dated July 29, 2016 states, "the pt requested to discuss having a interpreter throughout the day."

58.     On July 29, 2016, attorney Amy Robertson from the Civil Rights Education and Enforcement Center sent an email to Tanner and Assistant Administrator, Nick Sorenson, stating, in pertinent part:

> Our organization is working with Cynthia Mullen, who is currently a patient at Orchard Park Health Care Center following amputation of her right leg last month. Ms. Mullen is deaf and I am writing to request that Orchard Park provide her with a sign language interpreter for her interactions with doctors, nurses, and physical therapists and to provide information in support of that request.
>
> Ms. Mullen has been requesting interpreters since she arrived at Orchard Park late last month. It is my understanding that, as of a few days ago, Orchard Park has been providing her interpreters for her physical therapy, which she very much appreciates. However, it is essential that Ms. Mullen, whose first language is American Sign

Language and who does not communicate well in written English, understand what is being said to her and about her by medical staff when they come to her room. . . . .

I understand Orchard Park personnel have been relying on Ms. Mullen's partner, Debbie Johnson, to interpret. This is wrong for several reasons: Ms. Johnson is not a qualified certified sign language interpreter; and it is not, in any event, appropriate to rely on a person accompanying a deaf person to interpret, or to require a deaf person to bring her own interpreter, 28 C.F.R. § 36.303(c) (2), (3).

Because Ms. Mullen will not be able to fully and accurately understand discussions concerning diagnosis, treatment, and other medical information if conducted in spoken English or by written notes, she requires a qualified sign language interpreter for these interactions.

59.     Tanner responded to Robertson informing her, in part, that Orchard Park was "providing [Mullen] an interpreter for her therapy services and when there are known doctors' visits we are coordinating that with the interpreter visits. We also have a full time LPN who is working the wing that Cynthia is on who is fluent in sign language."  Emails, ECF 96-6.  There were no further communications between Robertson and Orchard Park staff.

60.     A PT Daily Treatment Note dated Saturday, August 6, 2016 states in part, "PT did not have interpreter today and was hesitant to therapy [sic]. Pt agreed to do therapy in afternoon without interpreter."

61.     A Health Status Note dated August 17, 2016 states in part:

Resident insisted visitor translate as opposed to reading notes from this nurse. Translator reports Resident prefer not to see PA today if she is not going to be in by 1500 because she was weak and tired. Felt it was too much to try to communicate c Pa s translator. Shortly p [sic] this nurse exit room, overheard this resident crying out load [sic]. Translator stated she cont to c/o increased pain. Administered schedule Tyl and Lyrica.

62.     A Physical Therapist Daily Treatment Note dated September 1, 2016 states, "[Mullen] was unable to be seen due to the interpreter not being present during our schedule [sic] time."

10

63.     Dr. Miller and Dr. Long were Mullen's physicians for pain management.  Mullen had no

problem communicating with Dr. Long because the doctor always had an interpreter with her.  First

Deposition of Cynthia Mullen, August 19, 2019, ("Mullen Dep. I") 86: 24 – 87: 2, ECF 96-1.

64.     A Nurse Practitioner Progress Note-Narrative dated September 8, 2016 states in part:

> Did meet with Dr. Long today on September 8th, who said that unfortunately [s]he
> went to see the patient, but the patient interpreter had left for the day. Dr. Long
> reports returned back on 9th and did feel that she is on too much medication,
> especially that she has been several weeks out from initial amputation.

65.     A Physical Therapist Daily Treatment Note dated September 9, 2016, states in part, "Dr.

Long and case manager wanted to speak longer so this PTA stopped session with explanation to

patient through interpreter. It was important for them to finish conversation as interpreter is here for

only 2 hours."

66.     A Therapist Progress and Discharge Summary dated September 11, 2016 indicates that

Mullen missed two skilled treatments since the last report because "both times interpreter not

present."

67.     Mullen attempted to communicate with Orchard Park's staff by writing on paper, writing on

a white board, attempting to read lips, and through Johnson's interpretation and ASL interpreters.

She also texted with physical therapy concerning her schedule.

68.     April Lloyd was a registered nurse at Orchard Park; Mullen testified that Lloyd understood

her needs.  Mullen Dep. I, 99: 17 - 100: 7, ECF 96-1.

69.     Mark Lyons was an occupational therapist at Orchard Park who, according to Mullen, was

a "funny man" and "loved joking." *Id.* 100: 14-19.[1]

---

[1]Defendants assert additional information about Lyons, but they did not attach a copy of
the deposition transcript page from which the information apparently derives.

11

70.     Mullen received physical therapy while at Orchard Park and met her goal of being able to walk with a walker.  Second Deposition of Cynthia Mullen, November 18, 2019 ("Mullen Dep. II") 123: 3-23, ECF 96-2.

71.     Mullen received occupational therapy while at Orchard Park and met at least some of her therapy goals before discharge.  *Id.* 123: 24 – 124: 15.

72.     Mullen met Sue Weiler on a dating website while she was a resident of Orchard Park.  Mullen and Weiler dated for a period of time when Mullen resided at Orchard Park.  Weiler is hearing and does not know sign language.

73.     Mullen communicated with her friends on her phone through text and Facebook while at Orchard Park, and invited staff members of Orchard Park to be her "friends" on Facebook while she was a resident there.

74.     Mullen was not, at the time of her deposition, in imminent need of Orchard Park's services.  *See* Mullen Dep. I, 36: 4 – 38: 4, ECF 79-4.  Mullen testified that when she received orders for outpatient physical therapy approximately one year after her discharge from Orchard Park, she called Orchard Park and a representative informed her the facility could not accept her because she "wouldn't be a live-in" and Orchard Park "didn't have interpreters."  *Id.*

75.     No services were requested by Johnson individually nor denied by Orchard Park to Johnson individually.

76.     Mullen has received outpatient physical therapy at places other than Orchard Park and (at the time she gave deposition testimony) planned to return to the same facility where she was being treated at the time of her deposition for any future therapy.

77.     Defendant CCHC is a Georgia Limited Liability Company that provides management

services to Orchard Park.  Affidavit of Deborah P. Kennedy for Clear Choice Health Care LLC, January 9, 2020 ("Kennedy/CCHC Aff."), ¶ 4, ECF 79-2.

78.     CCHC does not receive direct federal financial assistance.  Kennedy/CCHC Aff. at ¶ 13.

79.     Defendant SBK is a 99% owner of Orchard Park; the other 1% is owned by SBK, LLC.

80.     SBK does not receive direct federal financial assistance.  *See* Affidavit of Deborah P. Kennedy for SBK Capital, LLC, January 9, 2020 ("Kennedy/SBK Aff."), ¶ 6, ECF 79-1.

81.     SBK does not lease (or lease to) or operate Orchard Park.  *See id.* at ¶¶ 7-8, 10.

82.     The employees of Orchard Park are not employees of SBK or CCHC.  *See* Kennedy/SBK Aff. ¶ 9, ECF 79-1; Kennedy/CCHC Aff. ¶ 8, ECF 79-2.

83.     At the time of their depositions, neither Mullen nor Johnson knew who or what CCHC or SBK were.  *See* Mullen Dep. II, 9: 16 – 11: 5, ECF 79-5; Johnson Dep. 51: 1 – 52: 6; 82: 15 – 84: 1, ECF 79-6.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative

defense—his[, her, or its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id.* at 1154 (quoting 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015)). Only evidence for which the content and substance are admissible may be considered when ruling on a motion for summary judgment. *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324); *see also Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v.*

*Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)).  "The court views the record and draws all inferences in the light most favorable to the non-moving party."  *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

The parties' respective motions seek summary judgment on various claims, parties, and legal theories.  The Court will address each motion and argument as presented.

## I.     Defendants' Motion

Defendants contend they are entitled to summary judgment on all claims alleged against them by Johnson (second, fourth, sixth, and eighth claims for relief), on all claims alleged against SBK and CCHC, on Mullen's claim for outrageous conduct, and on all requests for injunctive relief.  The Court will begin by determining whether Plaintiffs' claims should proceed against SBK and CCHC, then analyze whether Johnson's claims, the state tort claim, and any remaining claims for injunctive relief should be heard by a jury.

### A.     ADA Claims

Defendants argue that Plaintiffs' ADA claims against SBK and CCHC fail because SBK and CCHC are not "places of public accommodation" as required by the statute.  Plaintiffs counter that SBK and CCHC operate Orchard Park and, thus, are proper Defendants under the statutes.

Title III of the ADA prohibits discrimination against persons with disabilities in places of public accommodation. 42 U.S.C. § 12182(a). Section 12182(a) provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation **by any person who owns, leases (or leases to), or operates a place of public accommodation**."  *Civil*

*Rights Educ. & Enf't Ctr. v. Sage Hosp. Res. LLC*, 222 F. Supp. 3d 934, 947 (D. Colo. 2016) (emphasis added) (citing § 12182(a) and *Colo. Cross Disability Coalition v. Hermanson Family Ltd. P'ship*, 264 F.3d 999, 1002 (10th Cir. 2001)).  Title III itself does not define the terms "owns, leases or operates"; thus, courts have followed the Fifth Circuit's opinion in *Neff v. American Dairy Queen Corp.*, 58 F.3d 1063 (5th Cir. 1995), *cert. denied*, 516 U.S.1045 (1996), and looked at the ordinary meaning of the terms to determine the amount of control required to trigger the ADA's requirements:

> Because the ADA does not define the term "operates" we "construe it within its ordinary and natural meaning." *Smith v. United States*, [508 U.S. 223,] 113 S. Ct. 2050, 2054, 124 L. Ed. 2d 138 (1993)....To "operate," in the context of a business operation, means to put or keep in operation," The Random House College Dictionary 931 (Rev. ed. 1980), "[t]o control or direct the functioning of," Webster's II: New Riverside University Dictionary 823 (1988), "[t]o conduct the affairs of; manage," The American Heritage Dictionary 1268 (3d ed. 1992).

*Id.* at 949-50 (quoting *Neff*, 58 F.3d at 1066); *see also Emerson v. Thiel College*, 296 F.3d 184, 189 (3d Cir. 2002); *Dahlberg v. Avis Rent A Car Sys., Inc.*, 92 F. Supp. 2d 1091, 1102 (D. Colo. 2000). The court in *Neff* specified that "the relevant question in this case is whether [the defendant], according to the terms of its franchise agreements . . . , controls modification of the [places of public accommodation] to cause them to comply with the ADA." *Neff*, 58 F.3d at 1067; *see also Colon v. League of United Latin Am. Citizens*, 91 F.3d 140 (Table), 1996 WL 400201, at *2 (5th Cir. June 12, 1996) ("[T]o be an 'operator' requires more than simply controlling some aspect of a public accommodation. Rather, **the person must have control over the modification sought by the plaintiff**.") (emphasis added).

Here, no party disputes that Orchard Park is a place of public accommodation under the ADA.  Thus, to demonstrate SBK and/or CCHC is a covered entity under the ADA, the Plaintiffs

must establish that SBK and/or CCHC "owned" or "operated" (*i.e.*, had control over) the modification requested by Plaintiffs at Orchard Park, namely the provision of certified ASL interpreters. *See Colon*, 1996 WL 400201, at *2 (citing *Neff*, 58 F.3d at 1065) ("Whether [defendant] is an "operator" for purposes of assessing ADA liability is a question of law . . . ."); *Dahlberg*, 92 F. Supp. 2d at 1105 (finding "as a matter of law" that defendant did not operate the public accommodation during the relevant time period).

      1.    *CCHC*

The parties do not appear to dispute that CCHC provides management services to Orchard Park. Plaintiffs argue a genuine factual issue exists as to whether CCHC had the authority to "control" and to "independently step in and fix the discriminatory conditions" at Orchard Park by referencing the Management Agreement between the entities. *See* Management Agreement ("MA"), ECF 97-1. Specifically, Plaintiffs point to the "Grant of Authority" provision (¶ 2.1), the list of "Manager Services" provision (¶ 4.1(a)), the "Personnel" provision (¶ 4.1(d)), the "Contracts" provision (¶ 3.5), the "Outside Services" provision (¶ 4.1(f)), and the "Compliance with Laws" provision (¶ 4.1(k)). Plaintiffs assert that these provisions and the deposition testimony discussing them demonstrate CCHC "operates" Orchard Park under the ADA.

Defendants counter that "the relevant inquiry is whether CCHC controlled the discriminatory conduct, condition, or accommodation" (Reply 6) and that Plaintiffs can point to no evidence that CCHC "controlled" the provision of ASL interpreters to Orchard Park residents or, specifically, the provision of an interpreter for Mullen. Defendants cite the Fifth Circuit's opinions in *Neff* and *Colon, supra,* for support of this position (*id.* at 5-6); however, the Court finds that neither *Neff* nor *Colon* require evidence that the entity, in fact, "controlled" the requested accommodation at the time

17

it was requested in determining whether the entity is "covered" under the statutes. *See Neff*, 58 F.3d at 1067 ("the relevant question in this case is whether [defendant], according to the terms of its [ ] agreements with [franchisees], **controls** modification of the San Antonio Stores to cause them to comply with the ADA") (emphasis added); *see also Colon*, 1996 WL 400201, at *2 (to be an "operator" under the circumstances of that case, "[defendant] **must have had the authority** to allow [plaintiff] to" participate in the requested modification) (emphasis added); *Emerson*, 296 F.3d at 189 ("Applying [*Neff's*] definitions, we hold that the individual college defendants and Brown **do not operate** [defendant] and thus are not subject to individual liability under Title III of the ADA.") (emphasis added); *Dahlberg*, 92 F. Supp. 2d at 1103 (licensing agreement "did not give [defendant] any sort of control over the operations of the licensee in any day-to-day fashion, nor did it give [defendant] the power to direct operations as pertains to the allegedly discriminatory conditions at the [place of public accommodation]").

While Defendants' argument as to whether CCHC actually controlled the provision of an interpreter for Mullen (or other Orchard Park residents) may be relevant to the issue of whether CCHC was itself liable under the ADA and/or ACA for Plaintiffs' alleged injuries, the argument is irrelevant to the legal question whether CCHC was a covered entity under the statutes. The Court finds the Plaintiffs have demonstrated, through the MA and other evidence, that CCHC "operates" Orchard Park for purposes of the ADA.

First, the MA grants to CCHC the "exclusive authority to manage, direct, and supervise" Orchard Park. MA ¶ 2.1; Rule 30(b)(6) Deposition of Clear Choice Health Care, August 22, 2019 ("CCHC Dep.") 138: 8 – 139: 9, ECF 97-3 ("Clear Choice is [solely] responsible for managing [Orchard Park]."); *id.* 157: 12-16 ("Clear Choice Health Care is required to manage the day-to-day

operation of the facility."). Included in CCHC's authority is the ability "to make and enter into such contracts and agreements for the provision of . . . labor to or for the benefit of [Orchard Park] as required in the ordinary course of business for the operation, maintenance and service of [Orchard Park]." MA ¶ 3.5. CCHC admits that this provision would authorize CCHC to enter into a contract for interpreting services for the benefit of a patient at Orchard Park, "if the facility did not handle it themselves." CCHC Dep. 155: 5-16. Similar to paragraph 3.5, paragraph 4.1(f) grants to CCHC the authority to "enter into reasonable ongoing agreements for the purchase or rendering of . . . all services . . . necessary to the reasonable maintenance and operation of [Orchard Park]." MA ¶ 4.1(f). Finally, the MA requires that CCHC "use commercially reasonable efforts to take such action as shall be necessary or appropriate to insure that [Orchard Park] materially complies with all Laws." MA ¶ 4.1(k). CCHC "learns about whether it needs to take these steps through its oversight and involvement in the day-to-day activities" at Orchard Park. CCHC Dep. 202: 4-17.

Based on this evidence, the Court finds CCHC "operates" Orchard Park, which is a place of public accommodation under the ADA.[2] The Court will deny Defendants' motion for summary judgment based on this theory.

        2.    *SBK*

Plaintiffs argue that SBK is a 99% owner of Orchard Park and, thus, "it is a proper Defendant subject to liability under the plain meaning of the ADA." Resp. 12 n.8. Defendants concede that SBK is a 99% "member" of Orchard Park but argue that its membership "does not convey the liability of the facility to it." Mot. 10. Even if true, however, Defendants cite no authority for the

---

[2]Although the ACA is addressed below, the Court also finds this evidence sufficient to demonstrate CCHC is an entity that operates a health program or activity under the ACA.

proposition that the structure of an LLC prohibits it from being deemed an "owner" of a public accommodation under the ADA.  In fact, Colorado law provides that "[e]ach limited liability company formed and existing under this article may . . . sue and be sued, complain and defend, and participate in administrative or other proceedings, in its name." Colo. Rev. Stat. § 7-80-104(1)(a). While Defendants appear to be correct that SBK—an LLC that is a member of Orchard Park, another LLC—would not be liable for the "debts incurred" by Orchard Park, nothing indicates that SBK cannot be held liable for its own conduct.

SBK admits that it is an owner of Orchard Park.[3] CCHC Dep. 93: 20-22 ("Q. SBK Capital, LLC owns 99 percent of Orchard Park, right? A: South Denver Rehabilitation, LLC, yes."). Thus, SBK is a covered entity under the ADA.  *See, e.g., Kurlander v. Kroenke Arena Co., LLC*, 276 F. Supp. 3d 1077, 1081 (D. Colo. 2017) (court certified class against LLC defendant, the owner and operator of the Pepsi Center); *Lugo v. 141 NW 20th St. Holdings, LLC*, 878 F. Supp. 2d 1291, 1294 (S.D. Fla. 2012) (plaintiff properly pled a Title III claim against LLC defendants who owned shopping/office center).  The Court will deny Defendants' motion to dismiss SBK under this theory.

B.     Rehab Act/ACA Claims

Defendants argue that Plaintiffs fail to demonstrate any material factual issues as to whether SBK or CCHC receive "federal financial assistance" as necessary to hold them liable under the Rehab Act and ACA.  Plaintiffs counter that Defendants admit they "receive Medicaid and Medicare

---

[3]Defendants argue that SBK does not own or lease the building or property at which Orchard Park resides.  If this Title III action alleged unlawful physical barriers on the property at Orchard Park, Defendants' argument may be more persuasive; however, the requested modification is to *services* provided by Orchard Park, the company, not to the building or property.

funding and payments" and, thus, while they may not receive direct assistance, they are indirect recipients of federal funds, which is sufficient under the statutes.

To state a claim under Section 504, "a plaintiff must prove [that] (1) [ ] he is a 'handicapped individual' under the Act, (2) [ ] he is 'otherwise qualified' for the [benefit] sought, (3) [ ] he was [discriminated against] solely by reason of his handicap, and (4) [ ] the program or activity in question receives federal financial assistance." *Cohon ex rel. Bass v. New Mexico Dep't of Health*, 646 F.3d 717, 725 (10th Cir. 2011) (citing *Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1492 (10th Cir. 1992)).  With respect to the fourth element, the Supreme Court has observed "[t]here is no distinction between direct and indirect aid," explaining "[i]t was [an] unusual disbursement pattern of money from the Government through an intermediary (the students) to the intended recipient [the college] that caused us to recognize that federal financial assistance could be received indirectly." *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 607 (1986) (citing *Grove City College v. Bell*, 465 U.S. 555, 564 (1984)).  The Court cautioned that "federal coverage [does not] follow[ ] the aid past the recipient to those who merely benefit from the aid." *Id.*  The Court concluded that airport operators, not airline companies, received the aid (*i.e.*, funds granted for airport development), while the airlines merely "benefit[ted] from the airports' use of the aid." *Id.*  Subsequently, citing *Paralyzed Veterans*, the Supreme Court likened the non-discrimination provisions of the Rehab Act to Title IX of the Education Amendments of 1972 and concluded: "Entities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; entities that only benefit economically from federal assistance are not." *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999).

Notably, before *Smith*, the Tenth Circuit applied "the ordinary meaning of the term and conclude[d] that an entity receives [federal] financial assistance when it receives a subsidy." *Klick v. Hercules, Inc.*, 5 F.3d 546, 1993 WL 318833, at *3 (10th Cir. Aug. 19, 1993) (citing *DeVargas v. Mason & Hanger–Silas Mason Co.*, 911 F.2d 1377, 1382 (10th Cir.1990), *cert. denied*, 498 U.S. 1074 (1991)).  Later, the Tenth Circuit cited *Paralyzed Veterans* in rejecting an argument that Rehab Act coverage extends only to *direct* recipients of federal funds: "The [Supreme] Court . . . made a distinction between recipients of federal funds and mere beneficiaries" and "acknowledged that 'coverage extends to Congress' intended recipient, whether receiving the aid directly or indirectly." *Bentley v. Cleveland Cty. Bd. of Cty. Comm'rs*, 41 F.3d 600, 604 (10th Cir. 1994) (quoting *Paralyzed Veterans*, 477 U.S. at 607).  In a subsequent case, the Tenth Circuit also cited *Paralyzed Veterans* for its warning that "federal coverage [does not follow] the aid past the recipient to those who merely benefit from the aid" and noted the Supreme Court "pointed out that if the statutes were construed to extend to all those who receive an indirect economic benefit from the federal assistance, '[t]he statutory "limitation" on [the anti-discrimination statute's] coverage would virtually disappear, a result Congress surely did not intend.'" *United States v. LaHue*, 170 F.3d 1026, 1030 (10th Cir. 1999).

With respect to § 1557 of the ACA governing "Nondiscrimination," "an individual shall not, on the ground prohibited under . . . [§ 504 of the Rehab Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . . ."  42 U.S.C. § 18116(a); *see also Cummings v. Premier Rehab Keller, P.L.L.C.*, 948 F.3d 673, 676 (5th Cir. 2020).  A "covered entity" under the ACA includes "[a]n entity that operates a health program or activity, any part of

which receives Federal financial assistance[.]" 45 C.F.R. § 92.4.  The definition of "health program

or activity" under the ACA is, in relevant part:

> the provision or administration of health-related services, health-related insurance
> coverage, or other health-related coverage, and the provision of assistance to
> individuals in obtaining health-related services or health-related insurance coverage.
> For an entity principally engaged in providing or administering health services or
> health insurance coverage or other health coverage, all of its operations are
> considered part of the health program or activity, except as specifically set forth
> otherwise in this part. Such entities include a hospital, health clinic, group health
> plan, health insurance issuer, physician's practice, community health center, nursing
> facility, residential or community-based treatment facility, or other similar entity.

*Id.*  Here, no party disputes that Orchard Park is an entity that operates a health program or activity

under the ACA and receives federal financial assistance under both statutes.

Thus, to demonstrate SBK and CCHC are covered entities under the Rehab Act and the

ACA,[4] the Plaintiffs must identify a genuine issue of material fact as to whether SBK and CCHC

are intended recipients of federal financial assistance, who receive such funds either directly or

indirectly "through an intermediary."  *Smith*, 525 U.S. at 468; *Bentley*, 41 F.3d at 604.  "As [the

Supreme Court has] ma[d]e clear, distinguishing between recipients and beneficiaries requires

evaluation both of Congress's intent and of a party's ability to accept or reject the federal funding."

*Alfano v. Bridgeport Airport Servs., Inc.*, 373 F. Supp. 2d 1, 6 (D. Conn. 2005) (citing *Paralyzed

Veterans* and *Grove City*, *supra*).

The parties do not dispute that an entity which accepts Medicare and Medicaid funding is

subject to the Rehab Act and the ACA.  *See Havens v. Broken Arrow Bone & Joint Specialists, P.C.*,

No. 07-CV-319-GKF-FHM, 2008 WL 11509971, at *2 (N.D. Okla. Mar. 25, 2008) ("The clear

---

[4]42 U.S.C. § 18116(a) expressly provides that the "enforcement mechanisms provided for
and available under such title VI, title IX, section 504, or such Age Discrimination Act shall
apply for purposes of violations of this subsection."

weight of federal case law presently supports the proposition that Congress intended Medicaid and Medicare to constitute 'federal financial assistance' for the purposes of Section 504 of the Rehabilitation Act of 1973."). They also agree that Orchard Park is "indisputably a recipient of federal financial assistance through its participation in Medicare/Medicaid programs." Reply 8. Defendants contend, however, that SBK and CCHC are neither direct nor indirect recipients of any federal financial assistance. They argue that Rehab Act coverage does not extend "past the intended recipient to those who merely derive a benefit from the aid or receive compensation for services rendered pursuant to a contractual arrangement." Reply 9 (citing *Hamilton v. Illinois Cent. R.R.*, 894 F. Supp. 1014, 1022 (S.D. Miss. 1995)).

Plaintiffs counter that the Fifth Circuit has addressed a situation similar to that presented here and determined that a private company providing respiratory therapy services to a hospital receiving federal funds was also a recipient covered by the Rehab Act. Resp. 25-26 (citing *Frazier v. Bd. of Trustees of Nw. Miss. Reg'l Med. Ctr.*, 765 F.2d 1278, 1289-90 (5th Cir. 1985)). The Court notes, however, that *Frazier* was decided before the Supreme Court's opinions in *Paralyzed Veterans* and *Smith* and, while the Fifth Circuit cited to *Grove City College v. Bell*, 465 U.S. 555 (1984) for the proposition that indirect recipients of federal funds may be covered under the Rehab Act, the court did not actually determine whether the private entity defendant was an "intended recipient" of federal financial assistance or evaluate its ability to "accept or reject federal funding." *See id.* Rather, the court analyzed the financial relationship between the private entity ("Lifetron") and the recipient hospital ("Northwest") and concluded that Lifetron had direct involvement in Northwest's claims for reimbursement from Medicare/Medicaid:

> viewing the evidence most favorably to appellant, the respiratory therapy department kept weekly tallies of the number of Medicare and Medicaid patients treated in the

department. Record vol. 2, at 432–35. More importantly, the contract provided that Lifetron would recompense Northwest in the event that "third-party payors" disallowed any of the hospital's claims for reimbursement based on services rendered by Lifetron. In light of these facts, it is difficult to fathom how Lifetron's interest in the hospital's federal assistance was limited to that of a disinterested spectator. Both Northwest and Lifetron reaped a percentage benefit of revenues generated by Medicare and Medicaid patients treated in the respiratory therapy department.

It is this mutual benefit that distinguishes Lifetron's womb-like financial situation from that of a private contractor with no material relationship to the recipient's receipt of federal funds. Unlike the hospital's privately-contracted mower of lawns, sweeper of floors, or supplier of aspirin, Lifetron contributes in a direct and tangible way to the hospital's claims for reimbursement under Medicare and Medicaid.

*Id.* In addition to *Frazier*, Plaintiffs cite district court opinions (outside this circuit) determining whether certain allegations were sufficient to allege indirect receipt of federal funds or whether a "controlling authority theory" may be applied to determine Rehab Act coverage.[5] Resp. 26. This Court notes that none of these district court opinions have been cited by a court in the Tenth Circuit; the Rule 12(b)(6) analyses are unhelpful to the Rule 56 analysis here; and the basis for the opinion advancing the controlling authority theory—"whatever implication arises out of *Paralyzed Veterans*

---

[5]Notably, Plaintiffs cite *Cureton v. NCAA*, 198 F.3d 107, 114 (3d Cir. 1999) for the proposition that the court "considered" four factors in determining whether the NCAA was an indirect recipient of federal funds. Resp. 24. However, the Third Circuit merely listed the factors considered by the district court and concluded: "We do not find it necessary to determine whether, by reason of the NCAA's relationship with the [National Youth Sports Program] or [its] Fund, we should regard the NCAA as receiving Federal financial assistance. Rather, we will assume without deciding that these relationships are sufficient to establish that Federal financial assistance to the Fund is assistance to the NCAA itself." *Id.* The court reversed the lower court's opinion concluding, "to the extent this action is predicated on the NCAA's receiving Federal financial assistance by reason of grants to the Fund, it must fail as the Fund's programs and activities are not in issue in this case." *Id.* at 115. While the court proceeded to evaluate whether the defendant had "controlling authority" over the subject programs or activities (a factor considered by the district court), it did so in response to the dissent's argument that the challenged program may be the "alter ego" of the defendant. *See id.* at 116-17.

is trumped by the Supreme Court's explicit analysis in *Cannon* [*v. Univ. of Chicago*, 441 U.S. 677 (1979)]"[6]—has not been adopted by another court.[7]

      1.    *CCHC*

Relying primarily on *Frazier*, Plaintiffs argue that CCHC is contracted to "maintain and renew . . . [for Orchard Park] approvals needed for participation in Medicare and Medicaid Programs"; to "act as Orchard Park's agent and control the process of submitting and receiving Medicare and Medicaid payments"; to "require Orchard Park to pursue financial claims even if Orchard Park determines a claim is not worth pursuing"; and, to "prepare[ ] Orchard Park's financial statements and dictate[ ] the budget for Orchard Park." Resp. 27-28. Plaintiffs conclude that "the level of control and subsequent transfer of funds [via contract for managerial services] makes Clear Choice an indirect recipient of federal financial assistance." Resp. 29.

Defendants reply that Congress's intent behind the Medicare/Medicaid program was to "enabl[e] the several States to make more adequate provisions for aged persons, blind persons, dependent and crippled children, maternal and child welfare, public health, and the administration of their unemployment compensation laws." Reply 10. Defendants assert that this demonstrates the beneficiaries of Medicare/Medicaid are "Americans who receive health care benefits under the programs and the health care providers who receive compensation under the programs" and "CCHC

---

    [6]*Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 735 (W.D. Mich. 2000).

    [7]*But see A.B. by C.B. v. Hawaii State Dep't of Educ.*, 386 F. Supp. 3d 1352, 1357 (D. Haw. 2019) (finding *Communities for Equity* "persuasive and instructive" without referencing the basis of its ruling).

does not fall in to either category." *Id.* Further, Defendants contend that this case is materially distinguishable from the circumstances presented in *Frazier*. *Id.* at 10-12.

While the Court agrees with Defendants' approach in examining congressional intent behind the Medicare/Medicaid programs, the Court is not convinced by Defendants' jump to the conclusion that CCHC does not "receive compensation under the programs." In determining whether the receipt of Medicare and Medicaid payments triggered Rehab Act coverage, the Fifth Circuit evaluated the law enacting the Medicare and Medicaid programs finding:

> One year after the passage of Title VI, Congress enacted Medicare and Medicaid as a means to assure that the aged, disabled, and poor would be able to secure necessary medical services. See Pub.L. No. 89-97, 79 Stat. 286. Under Medicare Part A, the subject of this lawsuit, the government pays the hospital for certain in-hospital treatment for those aged and disabled persons covered by the Act. The program is financed entirely by payroll tax deductions, 42 U.S.C. § 1395 (1983), and federal payments may be made only to hospitals which meet certain conditions of participation established by the Secretary of Health and Human Services. 42 U.S.C. § 1395d(d)(2) (1983). The Medicaid program provides to state governments federal funds that the state, after establishing a federally approved plan, uses to pay for medical aid for the poor and disadvantaged. 42 U.S.C. § 1396 (1983).

*United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1044 (5th Cir. 1984). The court concluded that "Congress intended Medicare and Medicaid to constitute 'federal financial assistance' for the purposes of Section 504" of the Rehab Act. *Id.* at 1045. Thus, it is clear that the intended beneficiaries of Medicare/Medicaid are not only aged, disabled, and disadvantaged patients, but also the "health care facilities and other providers" treating these patients. *See id.*

Here, then, the Court must determine whether CCHC is a "health care facility or other provider" receiving Medicare/Medicaid funds. The Supreme Court has emphasized that courts must consider a party's "ability to accept or reject the federal funding." *See Paralyzed Veterans*, 477 U.S. at 606–07 (concluding that while the funds were used for projects such as runway or taxiway

construction that benefitted the airlines, the airlines were in no position to accept or reject the federal

funding).  Defendants argue that, like the airport operators in *Paralyzed Veterans*, "Orchard Park

would be reimbursed for the patient care rendered to Medicare and Medicaid beneficiaries . . ., with

or without the services provided by CCHC."  Reply 12.  Even if this is true, however, Defendants

do not address Plaintiffs' contention that, under the management contract between CCHC and

Orchard Park in effect at the relevant time, Orchard Park paid CCHC a management fee equal to 6%

of Orchard Park's annual income before expenses, and Orchard Park's income included payments

from Medicare and Medicaid programs.  *See* MA § 5.1.  In addition, CCHC had the responsibilities

not only to  "maintain and renew as necessary . . . approvals needed for participation in Medicare

and Medicaid programs," but also to "prepare and file, or supervise the preparation and filing of .

. . Medicare [and] Medicaid . . . reports and claims related to revenue production of the facility" and

to "administer, process, and collect . . . all private party insurance, Medicare, Medicaid, and other

receivables."  MA §§ 4.1(g), (h), ECF 97-1 at 8-9.  The Court finds that these responsibilities,

particularly the processing and collection of Medicare/Medicaid payments on behalf of Orchard

Park, establish CCHC may have had (or has) the ability to accept and/or reject federal financial

assistance provided to Orchard Park.  The Plaintiffs have demonstrated a genuine issue of material

fact as to whether CCHC is a covered entity under the Rehab Act and ACA and, thus, Defendants'

motion for summary judgment will be denied in this respect.

        2.    *SBK*

In light of this Court's holding that SBK is an "owner" of Orchard Park, it must follow that

SBK is a recipient of federal financial assistance provided to Orchard Park in the form of

Medicare/Medicaid payments.  *See, e.g., United States v. Hersom*, 588 F.3d 60, 65-66, 68 (1st Cir.

2009) (court analyzed *Grove City*, *Paralyzed Veterans*, and *Smith* to determine that private owner of property renovated with funds from the Department of Housing and Urban Development was "intended recipient of federal financial assistance" under 18 U.S.C. § 844(f)); *see also Moreno v. Consolidated Rail Corp.*, 99 F.3d 782, 788 (6th Cir. 1996) (defendant, a private owner of improvements to railroad crossings funded by federal and state highway administrations, was recipient of federal financial assistance under the Rehab Act).  The Court will deny Defendants' motion seeking dismissal of Plaintiff's Rehab Act and ACA claims against SBK under this theory.

However, to be a covered entity under the ACA, SBK also must "operate a health program or activity."  See 45 C.F.R. § 92.4 ("Covered entity means: (1) An entity that operates a health program or activity, any part of which receives Federal financial assistance. . . .").  Thus, SBK's ownership of Orchard Park does not appear to be sufficient to fall under the ACA's requirements; the Plaintiffs must demonstrate genuine issues of material fact as to whether SBK "operates" Orchard Park.  For the reasons set forth in the next section, the Court finds summary judgment is not proper on this issue.

3.     *Compensatory Damages*

Defendants argue that Plaintiffs cannot establish any conduct by SBK and/or CCHC that was "intentional" as required to recover compensatory damages under the Rehab Act and ACA.  Plaintiffs counter that deposition testimony reveals both CCHC and SBK knew about Plaintiffs' request(s) for an ASL interpreter but failed to act.

The Tenth Circuit "requires proof of intentional discrimination before a plaintiff can recover compensatory damages under section 504."  *Hamer v. City of Trinidad*, 924 F.3d 1093, 1108 (10th Cir.), *cert. denied sub nom. City of Trinidad, Colorado v. Hamer*, 140 S. Ct. 644, 205 L. Ed. 2d 386

(2019) (citing *Havens v. Colo. Dep't of Corr.*, 897 F.3d 1250, 1263 (10th Cir. 2018)). "[P]laintiffs are hard-pressed to receive any monetary damages unless they can prove that a service, program, or activity is intentionally discriminatory toward individuals with disabilities, which is surely the exception rather than the rule." *Id.*

Section 504 of the Rehab Act and Section 1557 of the ACA are both "Spending Clause legislation"; the Supreme Court has "explained that compensatory damages are available under Spending Clause legislation because federal-funding recipients are 'on notice' that accepting such funds exposes them to liability for monetary damages under general contract law." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 948 F.3d 673, 676 (5th Cir. 2020) (citing *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)). Thus, like the parties, the Court recognizes that Rehab Act and ACA claims are analyzed under the same legal standards for purposes of determining whether CCHC and/or SBK are entitled to summary judgment on Plaintiffs' claims for compensatory damages.

"[I]ntentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Havens*, 897 F.3d at 1264 (quoting *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999)). "The deliberate-indifference standard 'does not require a showing of personal ill will or animosity toward the disabled person'[;] . . . [t]he plaintiff must show, however, '(1) [that the defendant had] knowledge that a harm to a federally protected right [was] substantially likely, and (2) a failure to act upon that . . . likelihood.'" *Id.* (quoting *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1227 (10th Cir. 2009)) (internal quotation marks omitted). In this case, Plaintiffs must demonstrate a material factual issue as to whether SBK and

CCHC knew their conduct was substantially likely to violate Plaintiffs' statutory rights and SBK and CCHC failed to act on that likelihood.

a.     CCHC

Plaintiffs point to deposition testimony by Orchard Park's administrator, Tanner, who attested that, after receiving a July 29, 2016 letter from attorney Amy Robertson requesting an ASL interpreter for Mullen during her interactions with medical personnel at Orchard Park, he consulted CCHC's Vice President, Jason Canlas, who in turn informed CCHC's President, Jeffrey Cleveland, of the letter.  Cleveland testified that he advised Canlas to determine the meaning of "within reason" with respect to Orchard Park's legal requirement to provide an interpreter for Mullen by meeting with the patient and "family."  Deposition of Jeffrey Cleveland, November 14, 2019 ("Cleveland Dep."), 20: 3 – 21: 16.  Plaintiffs argue, therefore, that CCHC knew about the letter, but took "no corrective action . . . including, but not limited to, increasing Ms. Mullen's access to ASL interpreters from July 29, 2016  through . . . November 4, 2016."  Resp. 32.  Plaintiffs add that CCHC knew from the date of Mullen's admission that she was deaf and required assistance with communication.  *Id.* at 33.

The Court finds the Plaintiffs raise a material factual issue as to whether CCHC engaged in intentional discrimination under the statutes.  The Tenth Circuit requires a plaintiff to show a defendant knew that a harm to a federal right was substantially likely; here, the Plaintiffs demonstrate that CCHC knew Mullen was deaf, her preferred form of communication was ASL, and she repeatedly requested an ASL interpreter.  Robertson's letter also notified Tanner (who, in turn consulted with CCHC's Vice President and President) that Mullen needed "a sign language interpreter for her interactions with doctors, nurses, and physical therapists," that using Johnson as

31

an interpreter was "wrong" under prevailing law, and that the exchange of written notes was insufficient under the ADA. *See* Letter, ECF 97-14. However, Mullen was not provided an interpreter for the first twenty-eight days of her stay at Orchard Park and, even after receiving Robertson's letter, Defendants continued to provide Mullen an interpreter for only two hours per day, five days per week despite the fact that patients at Orchard Park communicated with medical staff sporadically twenty-four hours per day, seven days per week. On these facts, a reasonable juror could find that CCHC knew harm would likely occur to Mullen's rights if she was not provided an ASL interpreter for all interactions with medical staff, and that CCHC failed to act on such likelihood.

b. SBK

Moreover, although it is a very close call, Plaintiffs raise a genuine issue as to whether SBK engaged in intentional discrimination. They identify Deborah Kennedy not only as a Vice President of SBK, but also as one who "materially participates on a regular, continuous, and substantial basis in the operation of the three Defendants." Resp. 34. Kennedy testified that "no one at the facility told [her] that there was a patient named Cynthia Mullen who needed a sign language interpreter." CCHC Dep. 118: 11-23, ECF 131-1. She also executed an affidavit stating: "SBK was unaware Ms. Mullen was a resident of Orchard Park, was deaf, used an interpreter or made any complaint about accommodations during her residency. SBK's [sic] first became aware Ms. Mullen had been a deaf resident at Orchard Park when it received a notice of claim letter well after the residency ended." Affidavit of Deborah Kennedy for SBK Capital, LLC, January 9, 2020 ("Kennedy Aff.") 13, ECF 79-1.

Plaintiffs contend "[i]t is not plausible that Deborah Kennedy . . . was unaware of Ms. Mullen's request for interpreters." Resp. 36. They direct the Court's attention to inconsistencies among Defendants' officials' deposition testimony concerning the facility's operations and Kennedy's knowledge about Mullen. *Id.* at 35-40. During the Rule 30(b)(6) deposition of SBK, Kennedy testified that, as Executive Vice President, she "would oversee any claims like [those involving the ADA] in her capacity at SBK Capital on behalf of any of the entities that SBK [had] investments in" (SBK Dep. 30: 11-17, ECF 97-4 ) and she "[did] claims management for the facilities that Clear Choice manage[d]" (*id.* 41: 2-15). Plaintiffs conclude:

> based on Ms. Kennedy's involvement as described with respect to SBK Capital's liability under the ADA; Ms. Kennedy's lack of credibility; Ms. Kennedy's role as the risk manager for Orchard Park and Clear Choice; Ms. Kennedy's membership on the Governing Body at Orchard Park with Mr. Cleveland; the various Clear Choice employees who knew about Ms. Mullen and the fact that Ms. Kennedy had regular meetings with these individuals; the fact that Mr. Tanner spoke to Mr. Canlas about Ms. Mullen; and Ms. Kennedy's involvement in the day-to-day operations of Orchard Park, there is enough circumstantial evidence that Ms. Kennedy, and thus, SBK Capital, knew [ ] that Ms. Mullen was disabled and failed to act.

*Id.* at 40. The Court finds the facts presented by Plaintiffs, including that SBK owns Orchard Park and that Kennedy was the individual responsible for handling ADA claims for Orchard Park,[8] are sufficient to demonstrate that a reasonable juror could conclude SBK knew (at some point during Mullen's stay) that a harm to Mullen from the lack of a full-time ASL interpreter was substantially likely and that SBK failed to act on that likelihood.

---

[8]Kennedy's conduct and responsibilities with respect to Orchard Park also demonstrate an issue of fact as to whether SBK "operated" (*i.e.*, had control over) the modification requested by Plaintiffs at Orchard Park, namely the provision of certified ASL interpreters. *See Colon*, 1996 WL 400201, at *2 (citing *Neff*, 58 F.3d at 1065).

The Court concludes that Plaintiffs raise material factual issues as to whether they are entitled to seek compensatory damages under the Rehab Act and ACA, and will deny Defendants' request for summary judgment as to Plaintiffs' claims for such damages.

C.      CADA Claims

Defendants contend that Plaintiffs failed to exhaust required administrative remedies before filing their claims under the Colorado Anti-Discrimination Act ("CADA"), and they cannot show that SBK and CCHC are places of public accommodation, as required by the statute.  Plaintiffs counter that CADA claims incorporate the same framework as ADA claims and, for the reasons already argued, SBK and CCHC are places of public accommodation.  In addition, Plaintiffs argue they need not exhaust administrative remedies for seeking relief under the specific provision of the CADA prohibiting discrimination by places of public accommodation, Colo. Rev. Stat. § 24-34-602.

While the Court agrees with Plaintiffs' first contention, it disagrees with the second. Plaintiffs ask the Court to follow the 1997 unpublished opinion of another court in this district finding that exhaustion of claims alleged pursuant to section 24-34-602 was not required.  *See Colo. Cross Disability Coal. v. Hermanson Family Ltd. P'ship I*, No. 96-cv-2490-AJ, 1997 WL 33471624, at *8 (D. Colo. Mar. 3, 1997).  In noting that Colorado's "entire statutory scheme, as it relates to exclusivity and exhaustion of administrative remedies for claims on the basis of disability, is somewhat cloudy," the court cited *Brooke v. Rest. Servs., Inc.*, 906 P.2d 66 (Colo. 1995) saying "the Colorado Supreme Court held that the [CADA] . . . does not require plaintiff to exhaust administrative remedies before filing her claim in state district court."  *Id.*  However, in *Brooke*, the court "address[ed] the issue of whether a claimant must exhaust administrative remedies under the [CADA] *before asserting common law claims in district court*" and "h[e]ld that administrative

remedies under the Act must be exhausted only for claims filed pursuant to the Act." *Brooke*, 906 P.2d at 70 (emphasis added). The *Brooke* court did not hold that plaintiffs need not exhaust administrative remedies before filing CADA claims. *See id.* at 72 ("we hold that section 24–34–306(14) was intended to require only that an individual claimant exhaust administrative remedies for claims brought pursuant to the Act"). Rather, the court referenced the plain language of the statute saying the CADA "requires exhaustion of administrative remedies before bringing claims 'based on an alleged discriminatory or unfair practice prohibited by parts 4 to 7 of this article." *Id.* at 70 (citing Colo. Rev. Stat. § 24–34–306(14)). The *Brooke* court concluded that "[w]hile the court of appeals read this clause to require exhaustion of administrative remedies before raising claims arising out of any discriminatory practices enumerated in the Act, it is more reasonable to read this clause as a reference to *all claims* brought pursuant to the Act." *Id.* (emphasis in original).

Part 6 of the CADA, under which Plaintiffs bring their claims, is included in the plain language of the statute requiring exhaustion of administrative remedies.[9] *See Zapata v. Colorado*

---

[9]Plaintiffs argue that, under section 24-34-602, "if a plaintiff were required to file a charge of discrimination prior to commencing a claim of discrimination by a place of public accommodation, then the plaintiff would be precluded from the relief authorized by Section 602." Resp. 42. The Court disagrees; subsection 602 provides that "[t]he relief provided by this section [a fine of not less than $50 and not more than $500 per occurrence] is an alternative to that authorized by section 24-34-306(9), and a person who seeks redress under this section is not permitted to seek relief from the commission." Colo. Rev. Stat. § 24-34-602(3). Section 24-34-306(9), in turn, states: "If, upon all the evidence at a hearing, there is a statement of findings and conclusions . . . showing that a respondent has engaged in or is engaging in any discriminatory or unfair practice as defined in parts 4 to 7 of this article, the commission shall issue and cause to be served upon the respondent an order requiring such respondent to cease and desist from such discriminatory or unfair practice and to take such action as it may order in accordance with the provisions of parts 4 to 7 of this article." Colo. Rev. Stat. § 24-34-306(9). The Court reads the plain language of the statutes to provide that a claimant's choice to proceed with a claim under subsection 602 means that the claimant may not seek a hearing before the commission nor a

*Christian Univ.,* No. 18-cv-02529-CMA-NYW, 2019 WL 1544179, at *3 (D. Colo. Mar. 15, 2019),

*report and recommendation adopted*, 2019 WL 1533239 (D. Colo. Apr. 9, 2019) (finding plaintiff

must exhaust administrative remedies for claim alleged pursuant to Colo. Rev. Stat. § 24-34-601 *et*

*seq.*).  Accordingly, the Plaintiffs must demonstrate that they exhausted administrative remedies

before filing their claims under the CADA.  *See id.* at *6 ("CADA requires exhaustion of

administrative remedies before a plaintiff may file suit in either state court or federal court.").

Because Plaintiffs fail to do so, the Court must grant summary judgment in favor of the Defendants

on the Plaintiffs' seventh and eighth claims for relief.

     D.    <u>Claims Brought by Johnson</u>

     With the exception of the outrageous conduct claim alleged in this case, Plaintiff Deborah

Johnson alleges claims for violations of the ADA, Rehab Act, ACA, and CADA against all

Defendants, although she is not, herself, disabled.  For reasons already stated, Johnson's CADA

claim is dismissed.  Additionally, Defendants argue that Johnson is "not a qualified individual with

a disability" as required by the Rehab Act and ACA,[10] and the regulation on which she relies for her

claim—28 C.F.R. § 36.303(c)(1)(i)—contemplates situations when a *disabled* companion is denied

services.  Plaintiffs counter that "any person aggrieved by an act or failure to act" pursuant to the

Rehab Act and ACA may bring a claim, including non-disabled persons.  Resp. 43-44.  Defendants

reply that the statutes to which Plaintiffs reference—29 U.S.C. § 794a(a)(2) and 42 U.S.C. §

12182(b)(1)(E)—require that a "companion" show he or she was "excluded or denied" "equal

_____

cease and desist, or other, order from the commission.

    [10]As recognized by the Plaintiffs (Resp. 43), Defendants do not seek summary judgment
as to Johnson's ADA claim based on a theory of companion liability.  *See* Mot. 9-12; Reply 16-
19.

goods, services, facilities, privileges, advantages, accommodations or other opportunities" because of an association with a disabled individual, and Johnson has failed to do so.  Reply 16-18.

Essentially, the Plaintiffs and Defendants each ask the Court to follow opposing decisions from the Second and Eleventh Circuits concerning associational standing under the Rehab Act.  For their proposition that Johnson "need only present evidence to establish a question of fact that [she] suffered an injury [causally] related to, but separate and distinct from, Mullen's injury," Plaintiffs cite to *Loeffler v. Staten Island University Hospital*, 582 F.3d 268, 280 (2d Cir. 2009).  Conversely, Defendants cite to *McCullum v. Orlando Regional Healthcare System*, 768 F.3d 1135, 1142 (11th Cir. 2014) for their position that non-disabled persons are required to show they were personally excluded, denied benefits, or discriminated against because of their association with a disabled person.[11]   While courts in other circuits have spoken on the issue, the Tenth Circuit has not addressed this question nor the opinions on which the parties rely.  *See Durand v. Fairview Health Servs.*, 902 F.3d 836, 844 (8th Cir. 2018) (recognizing the circuit split—*Loeffler* versus *McCullum*—as to the scope of associational standing under the ADA and RA, and finding that the defendant did not qualify for standing under either case); *R.S. By R.D.S. v. Butler Cty., Pennsylvania*, 700 F. App'x 105, 109 (3d Cir. 2017) (citing *McCullum* and finding the complaint was "devoid of factual allegations from which [it] may plausibly infer that the parents were personally excluded from participation in or denied the benefits of a covered activity or subjected to discrimination because of their son's disability.").

---

[11]Notably, both *Loeffler* and *McCullum* involve allegations–similar to those asserted here–that the defendant(s) failed to provide sign language interpreters and/or other accommodations for deaf plaintiffs and their families.

As asserted by Plaintiffs, the Rehab Act's associational standing provision states: "[t]he remedies, procedures and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available to *any person* aggrieved by any act or failure to act by any" entity subject to the Act. 29 U.S.C. § 794a(a)(2) (emphasis added). At the same time, the Rehab Act's provision prohibiting discrimination states: "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program" covered by the Act. 29 U.S.C. § 794(a). The question is whether section 794(a) limits the broader language of section 794a(a)(2).

In *Loeffler*, the Second Circuit found "[t]he standing provision of the RA, § 794a(a)(2), is distinct from the provision prohibiting discriminatory conduct on the part of the recipient of federal assistance, § 794(a)" and, thus, "the type of injury a 'person aggrieved' suffers need not be 'exclu[sion] from the participation in, . . . deni[al of] the benefits of, or . . . subject[ion] to discrimination under any program or activity receiving Federal financial assistance.'" 582 F.3d at 280. Rather, for associational standing, an "aggrieved" person must establish "an injury causally related to, but separate and distinct from, a disabled person's injury." *Id.* Notably, the chief judge of the Second Circuit dissented in part concluding that, with respect to associational standing, "the majority is expanding the [Rehab Act] in a way that is unsupported by precedent, text, logic, and prudence." *Id.* at 284.

Appearing to agree with this dissent, the Eleventh Circuit in *McCullum* expressly rejected *Loeffler*'s majority holding, concluding that section 794(a) limits the scope of section 794a(a)(2). 768 F.3d at 1142-45. The court determined that, if "non-disabled individuals were able to seek relief under the [Rehab Act] and ADA for injuries other than exclusion, denial of benefits, or

38

discrimination that they themselves suffer . . . it would mean that Congress granted non-disabled persons more rights under the ADA and [Rehab Act] than it granted to disabled persons, who can recover only if they are personally excluded, denied benefits, or discriminated against on the basis of their disability." *Id.* at 1143-44. The court "disagree[d] with *Loeffler*'s reasoning" asserting "[t]he associational standing provision of the [Rehab Act] should not be interpreted 'irrespective of § 794(a),' the provision that prohibits discrimination against disabled people." *Id.* at 1144. The court also disagreed that "non-disabled persons are denied benefits when a hospital relies on them to help interpret for a deaf patient." *Id.* Instead, the court held: "non-disabled persons have standing to seek relief under either [the Rehab Act or ADA] only if they allege that they were personally excluded, personally denied benefits, or personally discriminated against because of their association with a disabled person." *Id.* at 1143.

This Court finds persuasive those opinions following *McCullum* and finding that despite the broad language in 29 U.S.C. § 794a(a)(2), the word "any" is not limitless, particularly when considering the Rehab Act as a whole. *See McCullum*, 768 F.3d at 1143 ("But the Supreme Court has also said that 'broad language is not limitless' and 'a liberal construction nonetheless can find limits in a text's language, context, history, and purposes.'") (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007)). Mindful of the Supreme Court's admonitions that "statutory language . . . cannot be construed in a vacuum" and "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme,"[12] the Court agrees that, when reading section 794a(a)(2) in the context of section 794(a), the "proscribed [discriminatory] conduct is what

---

[12]*See McCullum*, 768 F.3d at 1143 (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) and *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

the statute makes unlawful, and a party is 'aggrieved' within the meaning of § 794a(a)(2) only if she suffers injury because she was subject to one of those types of conduct." *Id.*

Applying these standards to Johnson's claims, the Court finds that Johnson fails to raise a genuine issue of material fact as to whether she was personally excluded or denied benefits by Defendants, or whether she personally suffered discrimination by Defendants because of her association with Mullen. Plaintiffs assert that Johnson can "establish a question of fact" by demonstrating "that Defendants' failure to provide appropriate auxiliary aids caused Ms. Johnson fear, frustration and anger." Resp. 43-44. Plaintiffs merely cite to the operative pleading for this contention, but the Tenth Circuit has long held that a non-movant "may not rely on mere allegations, or denials, contained in its pleadings or briefs" in responding to a motion for summary judgment. *Lake Hefner Open Space All. v. Dole*, 871 F.2d 943, 945 (10th Cir. 1989) (citing *Bryant v. O'Connor*, 848 F.2d 1064, 1067 (10th Cir. 1988)); *see also* Fed. R. Civ. P. 56(c)(1).

Plaintiffs also rely on their statement of material facts for their contention that Johnson "became agitated when Defendants required [her] to attempt to interpret for Ms. Mullen." Resp. 44. However, the cited "facts" do not demonstrate any material dispute as to whether Johnson "became agitated" when she was "required" to interpret: SUMF ¶ 5 states Johnson was Mullen's caregiver; SUMF ¶ 6 states Johnson "does not reach a Level I (Novice I) on the sign language interpreter assessment tool used by the National Association of the Deaf"; SUMF ¶ 31 states an Orchard Park physical therapist testified that Johnson told her at their first meeting that she and Mullen "would file a lawsuit if an interpreter was not provided"; and SUMF ¶ 45 quotes the email from attorney Amy Robertson concerning Mullen's request for an ASL interpreter, in which Robertson explains why it was "wrong" for Orchard Park to rely on Johnson to interpret for Mullen; Robertson mentions

nothing about any injury to Johnson or whether Johnson felt any certain way about interpreting for

Mullen. *See* Mot. 3, 7, 10, ECF 80. The Court concludes that Plaintiffs fail to meet their burden to

"set forth specific facts showing the presence of a genuine issue of material fact for trial" as to

whether Johnson has standing to bring claims under the Rehab Act and ACA. *See Dole*, 871 F.2d

at 945. Thus, the Court will grant Defendants' motion for summary judgment on Plaintiffs' second

and sixth claims for relief.

  E.  <u>Outrageous Conduct Claim</u>

  Plaintiffs' ninth claim for relief alleges intentional infliction of emotional distress or

"outrageous conduct" by Defendants against Mullen. Defendants contend that "the present facts

provide an inadequate legal basis to sustain claims of outrageous conduct and punitive damages and,

therefore, the tort claims [sic] must be dismissed as a matter of law." Mot. 14. Plaintiffs respond

that Orchard Park was aware of Mullen's deafness, recent amputation, pain, and frustration from the

inability to understand and to express the extent of her pain, but the facility refused to provide

Mullen an interpreter, particularly with respect to necessary paperwork at the beginning of her stay

and interactions with medical personnel throughout her stay. Mullen experienced not only

frustration, but actual physical injury from the lack of an interpreter in the form of a worsening of

her carpal tunnel syndrome pain and hand neuropathy from communicating by writing, and her

hands were burned by heating pads (meant to treat her pain) based on a lack of communication with

carers. Mullen asserts that Clear Choice, as the entity responsible for ensuring compliance with

ADA, and SBK, as owner and entity responsible for handling ADA claims, are also liable for

outrageous conduct. Defendants reply that Mullen's allegations "amount to, at best, a claim for

negligence," and Orchard Park's willingness to allow Johnson to "live" with Mullen at the facility

and Mullen's testimony at a recent hearing belies her argument that Defendants' conduct was outrageous.

To prove outrageous conduct under Colorado law, a plaintiff must demonstrate: (1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in the conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the plaintiff incurred severe emotional distress which was caused by the defendant's conduct. *Cejka v. Vectrus Sys. Corp.*, 291 F. Supp. 3d 1231, 1249 (D. Colo. 2018) (citing *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994) (en banc)).  A defendant's actions must be

> so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Id.* (quoting *Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1350 (Colo. 1988)).  "Proof of the tort of outrageous conduct must consist of either an extreme act, both in character and degree, or a pattern of conduct from which the ineluctable conclusion is the infliction of severe mental suffering was calculated or recklessly and calculously inflicted." *Id.* (quoting *Gard v. Teletronics Pacing Sys., Inc.*, 859 F. Supp. 1349, 1354 (D. Colo. 1994)).  "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are insufficient [to establish outrageous conduct]." *Pearson v. Kancilia*, 70 P.3d 594, 597 (Colo. App. 2003).  But an uneven power relationship between a defendant and plaintiff or evidence that defendant, through threats or other conduct, caused a plaintiff to believe she had no choice in the matter may weigh in the plaintiff's favor. *Zueger v. Goss*, 343 P.3d 1028, 1037 (Colo. App. 2014) (citing *Pearson*, 70 P.3d at 598).

Although "the question of whether conduct is outrageous is generally one of fact to be determined by a jury, it is first the responsibility of a court to determine whether reasonable persons could differ on the question." *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999) (quoting *Culpepper*, 877 P.2d at 883). Here, the Court finds summary judgment is not appropriate on Mullen's outrageous conduct claim.

First, the power imbalance between Defendants and Mullen in communications about Mullen's health and well-being is undisputed; all persons with whom Mullen came in contact for care and treatment while at Orchard Park were hearing, English-speaking people. Also undisputed is the Defendants' awareness that Mullen had just undergone a leg amputation, she was in pain, and she was frustrated with the inability to communicate about her pain and well-being. *See, e.g.,* Notice of Admission, ECF 97-22; Pain Evaluation, June 26, 2016, ECF 97-25; Note to Richards, ECF 97-26; Grievance, June 29, 2016, ECF 97-29; Deposition of Ann Takahashi-Elliott, October 7, 2019 ("Elliott Dep."), 54: 3-11, ECF 97-31. The evidence indicates Orchard Park agreed that communication between patients and care providers occurred on and off twenty-four hours per day, seven days per week. Deposition of Emily Lynch, October 29, 2019 ("Lynch Dep."), 67: 5-19, ECF 97-37. Defendants did not provide Mullen with an ASL interpreter for the first twenty-eight days she resided at Orchard Park, after which an interpreter was provided for two hours per day, Monday through Friday, until Mullen was discharged months later. Mullen testified that she felt isolated, scared, paranoid, and frustrated with the lack of communication between herself and her care givers. Mullen Dep. 52: 11-21; 60: 5-15, ECF 97-21. The evidence also indicates that Orchard Park was aware of Mullen's feelings at the time. Note to Lyons, July 4, 2016, ECF 97-41 ("Here felt like prison" with hand-drawn frown); Elliott Dep. 71: 10 - 72: 17 (describing episode when Mullen was

43

crying and upset); Note, July 5, 2016, ECF 97-34 ("This rehab won't get me interpreter that's wrong that's very frustrade [sic] can't explain about pains.").

Whether Mullen's feeling that she had no choice but to use Johnson as an interpreter weighs in Mullen's favor, or whether Johnson's ability to interpret at times for Mullen and/or Mullen's recent testimony that she believed "the people [at Orchard Park] are friendly and it's the best place to go" belie Mullen's allegations supporting her outrageous conduct claim are for a jury to determine. At this stage, the Court finds reasonable persons could differ as to whether Defendants engaged in outrageous conduct by failing to provide Mullen an ASL interpreter during her stay at Orchard Park and, therefore, denies Defendants' motion seeking summary judgment on the ninth claim for relief.

With respect to Mullen's request for punitive damages, Defendants also contend that Plaintiffs "did not seek permission to seek punitive damages" related to the outrageous conduct claim as required by Colo. Rev. Stat. § 13-21-102(1.5)(a). Mot. 15. Plaintiffs did not respond to this contention; thus, Defendants must "provid[e] to the court the factual basis for its" argument. *Celotex Corp.*, 477 U.S. at 323.

The Court notes first that Defendants did not challenge the addition of Plaintiffs' request for punitive damages in the operative pleading at the time Plaintiffs sought leave to amend the initial Complaint. *See* Mot., ECF 22. However, even if Defendants were permitted to belatedly challenge the Plaintiffs' request for punitive damages, the Court finds they fail to meet their burden for summary judgment. The applicable statute provides:

> A claim for exemplary damages in an action governed by this section may not be included in any initial claim for relief. A claim for exemplary damages in an action governed by this section may be allowed by amendment to the pleadings only after the exchange of initial disclosures pursuant to rule 26 of the Colorado rules of civil

procedure[13] and the plaintiff establishes prima facie proof of a triable issue. After the plaintiff establishes the existence of a triable issue of exemplary damages, the court may, in its discretion, allow additional discovery on the issue of exemplary damages as the court deems appropriate.

Colo. Rev. Stat. Ann. § 13-21-102(1.5)(a). It is undisputed that the operative pleading is Plaintiffs' First Amended Complaint and Jury Demand filed October 26, 2018 (ECF 24), which was permitted by this Court's grant of an unopposed motion (ECF 22).[14] Plaintiffs did not seek punitive damages in the initial Complaint filed June 20, 2018 (ECF 1) and, according to the Scheduling Order, the parties "agree[d] to exchange Rule 26(a)(1) disclosures by August 30, 2018." *See* Order § 6(c), ECF 17; *see also* Mot. ¶ 4, ECF 21 (initial and supplemental disclosures exchanged by September 14, 2018). Thus, it appears that Plaintiffs met the first requirement for seeking punitive damages.

With respect to the second requirement that Plaintiffs establish prima facie proof of a triable issue, Colorado law provides: "In all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages." Colo. Rev. Stat. § 13-21-102(1)(a). "'[W]illful and wanton conduct' means conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." Colo. Rev. Stat.§ 13-21-102(1)(b). To the extent that Defendants rely on the same arguments they make concerning

---

[13]"To avoid forum shopping, Colorado federal courts apply this statute as if in reference to Federal Rule of Civil Procedure 26." *Residences at Olde Town Square Ass'n v. Travelers Cas. Ins. Co. of Am.*, 413 F. Supp. 3d 1070, 1073 n.1 (D. Colo. 2019).

[14]Thus, Defendants did not object to the Plaintiffs' addition of their request for punitive damages in the operative complaint.

Mullen's outrageous conduct claim (*see* Mot. 14-15), the Court finds Plaintiffs have raised genuine issues of material fact as to whether Defendants' conduct was "willful and wanton" or "purposefully committed . . . without regard to consequences" or to the rights and/or safety of Mullen.  The Court will deny Defendants' motion seeking summary judgment as to Mullen's request for punitive damages related to her outrageous conduct claim.

      F.      <u>Requests for Injunctive Relief</u>

For the remaining first, third, fourth, and fifth claims, Plaintiffs seek various forms of injunctive relief.  Am. Compl. 29-30.  To obtain a permanent injunction, the Plaintiffs must prove "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *United States v. Uintah Valley Shoshone Tribe*, 946 F.3d 1216, 1222 (10th Cir. 2020) (quoting *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007)).  Proving irreparable harm . . . is not "an easy burden to fulfill." *Husky Ventures, Inc. v. B55 Investments, Ltd.*, 911 F.3d 1000, 1011 (10th Cir. 2018) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).  "We do not deem harm 'irreparable' unless a petitioner can show 'a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.'" *Id.* (quoting *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016)).  "Purely speculative harm will not suffice, but '[a] plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative and will be held to have satisfied this burden.'" *Id.* (quoting *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011)) (citation omitted).

Moreover, Title III of the ADA, under which Plaintiffs bring their third and fourth claims for relief, provides <u>only</u> injunctive relief for violations of the statute. *Rhodes v. S. Nazarene Univ.*, 554 F. App'x 685, 690 (10th Cir. 2014) (citing 42 U.S.C. § 12188(a)(1) and *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004) ("A private individual may only obtain injunctive relief for violations of a right granted under Title III; he cannot recover damages.")).   To have standing to seek relief under Title III, a plaintiff "must demonstrate that she has indeed suffered a cognizable injury in fact that will be redressed by the relief sought." *Colorado Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1211 (10th Cir. 2014).   "When prospective relief—such as an injunction—is sought, 'the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future.'" *Id.* (quoting *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004)). The Tenth Circuit has distinguished between sufficient Title III allegations or evidence ("testimony of an intent to use buses 'several times per year' suggests a concrete, *present* plan to use" the buses) and insufficient allegations or evidence (plaintiffs "merely expressed a desire to *someday* visit places halfway around the world"). *Id.* (citing *Tandy*, 380 F.3d at 1284 and *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992)) (emphasis in original).

In this case, Plaintiffs seek the following injunctive relief:

a.    Defendants must cease discrimination on the basis of disability including, but not limited to, deaf patients and their companions.

b.    Defendants shall be required furnish appropriate auxiliary aids and services where necessary to ensure effective communication with people with disabilities unless Defendants can demonstrate that taking those steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or result in an undue burden.

c.      Defendants shall designate and shall continue to designate an ADA Compliance Officer. Defendants shall ensure that the ADA Compliance Officer undergoes training on Defendants' obligations under the ADA, at the expense of Defendants. The ADA Compliance Officer shall be responsible for handling disability-related complaints and for ensuring Defendants' continued compliance with the ADA.

d.      Defendants shall develop an ADA Complaint Resolution Policy to address ADA-related complaints. This policy shall identify the ADA Compliance Officer, the procedure for filing complaints, and the process by which complaints will be investigated and resolved.

e.      The ADA Complaint Resolution Policy shall be communicated to all Defendants' employees.

f.      Defendants shall retain a consultant to certify that all policies, alterations or additions to the facilities, will comply with the requirements of the ADA.

g.      Defendants shall, under the direction of the ADA Compliance Officer, train all Defendants' supervisors and managers on the obligations under the ADA. Defendants shall ensure that all newly hired supervisors and managers receive this training within thirty (30) days of hire or promotion.

h.      Defendants shall solicit periodic feedback from patients and staff to determine if the implemented policies ensure effective communication for deaf and hard of hearing individuals.

Am. Compl. 29-30.  Defendants argue that Plaintiffs lack standing to request injunctive relief, asserting that Mullen has completed her treatment at Orchard Park and neither she nor Johnson has plans to return; thus, Plaintiffs cannot demonstrate a "real and immediate threat" that they will be wronged in the future.  Plaintiffs counter that, at the time their response brief was filed on February 14, 2020, Mullen had recently undergone another amputation, was "qualified to receive skilled nursing services as part of her rehabilitation," and "plan[ned] to return to Orchard Park."  Resp. 52.

Plaintiffs' argument was fleshed out in a hearing on Plaintiffs' motion for preliminary injunction, filed days earlier on February 8, 2020.  *See* ECF 88.  Plaintiffs sought an immediate order enjoining Orchard Park from communicating with Mullen through written English and using

48

Johnson as an interpreter, and requiring Orchard Park to provide ASL interpreters throughout

Mullen's upcoming stay.  The Court held an evidentiary hearing on the motion on February 25,

2020, at which Plaintiffs proffered witness testimony; however, the hearing was cut short when the

ASL interpreters were required to attend another proceeding.  *See* ECF 102.  The Court ordered that

any remaining evidence be submitted on or before March 2, 2020.  *Id.*  The parties complied and the

following day, the Court issued an order denying the motion, finding:

> Ms. Mullen learned just prior to the February 25 hearing that Orchard Park does not
> accept her insurance; she does not argue this conclusion is based on discrimination
> prohibited by the ADAAA. Thus, the ball is in Ms. Mullen's court; she testified that
> she would go to Orchard Park despite the costs, and Dr. Christensen testified that
> Ms. Mullen needs skilled nursing services now (and has needed them since February
> 4, 2020), but there is no indication that Ms. Mullen has continued to pursue her
> application for admission to Orchard Park.  If she is not communicating and/or
> interacting with persons at Orchard Park, she is not suffering any injury.
> Accordingly, it is only speculative that Ms. Mullen's requests for relief—that
> Orchard Park refrain from communicating in English and provide certified ASL
> interpreters for all communications and interactions that occur between Orchard Park
> employees and Ms. Mullen—will redress claimed injuries by Orchard Park.

Order 11-12, ECF 113.  The Court concluded that, for purposes of the motion only, Plaintiffs failed

to demonstrate Mullen's standing to seek preliminary injunctive relief pursuant to Title III of the

ADA.  *Id.* at 12.

Since its March 3, 2020 order, the Court has received no additional argument nor evidence

from the Plaintiffs regarding their requests for injunctive relief in this case.  On March 27, 2020,

Plaintiffs filed a reply in support of their summary judgment motion (addressed below), but they

make no argument nor offer any additional evidence in support of their requests for injunctive relief

in that brief.  *See* ECF 128.  Thus, this Court must conclude that Mullen's status with respect to

Orchard Park—*i.e.*, that she has not interacted or communicated with employees of Orchard Park

or the other Defendants since November 2016, and has no plans to engage in such future interactions

49

and/or communications—is unchanged.  Moreover, there is no evidence that Johnson has any plans to interact with Defendants' employees.  Accordingly, the Court finds Plaintiffs have failed to demonstrate genuine issues of material fact as to whether a "real and immediate threat" exists or whether they will suffer an irreparable harm absent an injunction, and the Court will grant the Defendants summary judgment as to Plaintiffs' claims for injunctive relief in this case.  *See Cropp v. Larimer Cty., Colorado*, 793 F. App'x 771, 775 (10th Cir. 2019) (court "decline[d] to speculate about" whether plaintiff would be incarcerated "in the future" and, thus, found plaintiff lacked standing to seek injunctive relief on his ADA Title II and § 504 claims against county) (citing *Barney v. Pulsipher*, 143 F.3d 1299, 1306 n.3 (10th Cir. 1998)).

Because Plaintiffs have failed to demonstrate any entitlement to injunctive relief, the Court must dismiss their third and fourth claims for relief brought pursuant to Title III of the ADA.  *See Rhodes*, 554 F. App'x at 690 (upholding district court's dismissal of Title III claim seeking recovery of compensatory damages since Title III "provides for only injunctive relief").

G.      Conclusion

In sum, Defendants' motion will be granted in part and denied part; Plaintiffs' second (Rehab Act by Johnson), third (ADA by Mullen), fourth (ADA by Johnson), sixth (ACA by Johnson), seventh (CADA by Mullen), and eighth (CADA by Johnson) claims, as well their requests for injunctive relief, are dismissed.

**II.     Mullen's Motion**

Remaining in this case are Mullen's first (Rehab Act), fifth (ACA), and ninth (Outrageous Conduct) claims for relief.  Mullen seeks summary judgment against Orchard Park on her first and fifth claims, arguing that no genuine issues of material fact exist as to whether Orchard Park violated

her statutory rights by failing to provide interpreters, auxiliary communication aids, or other effective communication and by improperly relying on written notes in English or on Johnson to interpret for Mullen.  Defendants counter that material factual issues do, in fact, exist as to whether Orchard Park made reasonable accommodations for Mullen's disability and that prevailing law holds the question of whether an entity has provided appropriate auxiliary aids is typically a jury question. The parties agree that the legal standards governing adjudication of Rehab Act and ACA claims are the same (or materially similar).  *See* Resp. 13.

As set forth above, based on the language of the statute, to establish a claim under Section 504, "a plaintiff must prove [that] (1) [ ] he is a 'handicapped individual' under the Act, (2) [ ] he is 'otherwise qualified' for the [benefit] sought, (3) [ ] he was [discriminated against] solely by reason of his handicap, and (4) [ ] the program or activity in question receives federal financial assistance."  *Cohon*, 646 F.3d at 725.  Likewise, § 1557 of the ACA governs "Nondiscrimination" and provides: "an individual shall not, on the ground prohibited under . . . [§ 504 of the Rehab Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . . ."  42 U.S.C. § 18116(a).  Early on, the Tenth Circuit held that "[t]he standards for determining the merits of a case under [Section] 504 are contained in the statute" and set forth the following test for adjudicating Rehab Act claims, as relevant here:

> 1) The plaintiff must establish a prima facie case by showing that he was an otherwise qualified handicapped person apart from his handicap, and was rejected under circumstances which gave rise to the inference that his rejection was based solely on his handicap;
>
> 2) Once plaintiff establishes his prima facie case, defendants have the burden of going forward and proving that plaintiff['s] . . . rejection from the program was for reasons other than his handicap;

3) The plaintiff then has the burden of going forward with rebuttal evidence showing that the defendants' reasons for rejecting the plaintiff are based on misconceptions or unfounded factual conclusions, and that reasons articulated for the rejection other than the handicap encompass unjustified consideration of the handicap itself.

*Pushkin v. Regents of Univ. of Colorado*, 658 F.2d 1372, 1387 (10th Cir. 1981).

The United States Department of Health and Human Services ("HHS") enacted regulations "to effectuate § 504 of the Rehabilitation Act," some of which outline accommodations the federally funded "health, welfare, and social services" recipients should provide for disabled individuals. *Nordwall v. PHC-LAS Cruces, Inc.*, 960 F. Supp. 2d 1200, 1226 (D.N.M. 2013) (citing 45 C.F.R. Part 84.1). The Supreme Court has noted that these regulations provide "an important source of guidance on the meaning of § 504." *Id.* (quoting *Alexander v. Choate*, 469 U.S. 287, 304 (1985)). With respect to "auxiliary aids" for "sensory impaired" persons, the regulations provide in relevant part:

(1) A recipient to which this subpart applies that employs fifteen or more persons shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question.

. . . .

(3) For the purpose of this paragraph, auxiliary aids may include brailled and taped material, interpreters, and other aids for persons with impaired hearing or vision.

45 C.F.R. § 84.52(d).

The parties agree that Mullen was a qualified individual with a disability, and Orchard Park was a place of public accommodation that received federal funds. *See* Resp. 13, ECF 96. Thus, the question is whether Orchard Park discriminated against Mullen because of her disability—here, because she was deaf. In particular, the Court must determine whether genuine issues of material fact exist as to whether Orchard Park denied Mullen "appropriate auxiliary aids . . . where necessary

to afford [Mullen] an equal opportunity to benefit from" Orchard Park's skilled nursing services. Plaintiffs argue that Orchard Park not only denied Mullen's requests for a full-time ASL interpreter, but also denied Mullen "effective communication through ineffective auxiliary aids and services." Mot. 2.  Defendants cite several circuit opinions for the proposition that "whether an entity has provided appropriate auxiliary aids is a fact-intensive inquiry precluding summary judgment." Resp. 13-14.  Plaintiffs reply agreeing generally with Defendants' proposition but arguing that a court's focus at summary judgment must be on each interaction rather than on the interactions as a whole when determining whether fact issues exist.  Reply 13-14.

The Court finds Mullen has demonstrated a prima facie case in accordance with *Pushkin*. The undisputed facts show that before she was admitted, Orchard Park "red flagged" Mullen for her deafness and need for an interpreter.  Mullen requested an ASL interpreter as early as the second day of her stay at Orchard Park, during which she asked both an occupational therapist and her "guardian angel" for a "24/7" interpreter because Johnson was "not interpreter."  A physical therapist testified that, at about the same time, Mullen and Johnson told her they would file a lawsuit if an interpreter was not provided.  Three days after Mullen arrived, on June 29, 2016, Mullen's "guardian angel" filed a formal grievance on Mullen's behalf stating Mullen "needs ability to communicate with nurses for higher more complicated issues–concerned nursing not listening to her re: insulin and expiration date."  However, despite contacting an interpreter service early on, it was approximately twenty-nine days after Mullen's admission before Orchard Park hired an interpreter for Mullen.

Defendants counter the evidence reflects that Mullen and Johnson requested and Orchard Park granted, as part of Mullen's admission, that Johnson stay with Mullen for free room and board for several weeks so that Johnson could interpret for Mullen.  Orchard Park also provided a "white

board," and when Johnson was absent, she instructed staff to "write things down" for Mullen. Mullen concedes that she learned reading English in school, handles her own mail, pays her bills, has leased apartments and taught hearing persons ASL using the written word, and enjoys watching television and movies by closed caption, chatting on email and Facebook, and reviewing dating websites. Defendants contend that the majority of communication between Mullen and Orchard Park staff was "repetitive and familiar," and the only complaint Mullen expresses here about the inability to communicate was her inability to express her pain. Defendants assert that Mullen's pain was managed by doctors who were unaffiliated with Orchard Park.

Mullen asserts the evidence is unrebutted that Orchard Park failed to provide her skilled nursing services on at least four occasions when an interpreter was not present. Reply 16-17. While Defendants do not rebut that an interpreter was not present on these occasions, the question whether an interpreter was "necessary" to afford Mullen equal opportunity to services (45 C.F.R. § 84.52(d)(1)) on these occasions is disputed. *See Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 342 (11th Cir. 2012) (finding that "the task of determining whether an entity subject to the [Rehab Act] has provided appropriate auxiliary aids where necessary is inherently fact-intensive. . . . this does not mean that every request for an auxiliary aid that is not granted precludes summary judgment or creates liability under the [Rehab Act]."). Mullen does not expand on the challenged "undisputed" facts, explaining whether she refused treatment or whether the healthcare provider denied treatment because an interpreter was not present in each instance; such information, in addition to the specifics and context of the treatment, are important for a determination of whether an interpreter was "necessary" on that occasion. *See id.* ("Whether a particular aid is effective in affording a patient an equal opportunity to benefit from medical treatment largely depends on

context, including, principally, the nature, significance, and complexity of the treatment."). Thus, the facts are not sufficiently developed for the Court to grant summary judgment for Mullen.

In addition, Mullen contends that Orchard Park's provision of an ASL interpreter was untimely and, thus, violated Mullen's statutory rights. Mullen asserts that, during the period from June 29, 2016 to July 24, 2016, Orchard Park engaged with Mullen in therapy "almost every single day" without a certified interpreter, and its "decision to wait nearly one month to begin providing interpreters violated its obligation to provide 'auxiliary aids and services . . . in a timely manner.'" Reply 18-19. For this proposition, Mullen cites to a regulation promulgated under Title III of the ADA (*id.* at 20 (citing 28 C.F.R. § 36.303(c)(1)(ii)); however, Mullen's Title III claim has been dismissed. Even if the regulation properly applied to claims under the Rehab Act and/or ACA, the regulation also states that "[t]he type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place" and that "the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication." 28 C.F.R. § 36.303(c)(1)(ii). Whether the aids that were provided Mullen, including a dry erase board, pen and paper, and a nurse who was fluent in sign language (Email, August 6 2016, ECF 131-4 at 5) were "effective" is a question of fact that cannot be resolved on summary judgment. *Cf. Biondo v. Kaledia Health*, 935 F.3d 68, 74 (2d Cir. 2019), *cert. denied sub nom. Kaleida Health v. Biondo*, 140 S. Ct. 956, 206 L. Ed. 2d 120 (2020) ("While the Rehab Act does not in terms require the use of interpreters, a reasonable jury could find, given the circumstances, that the failure to provide one deprived [plaintiff] of an equal opportunity to benefit

from the hospital's services given her limitations with written English, the length of her hospital stay, and the procedures performed and information imparted during her stay.") (internal quotation marks omitted).

Citing another subsection of the same ADA regulation, Mullen also argues that Orchard Park improperly relied on Johnson to interpret for Mullen.  Reply 17-18 (citing 28 C.F.R. § 36.303(c)). The regulation provides:

> (3) A public accommodation shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication, except—
>
> (i) In an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available; or
>
> (ii) Where the individual with a disability specifically requests that the accompanying adult interpret or facilitate communication, the accompanying adult agrees to provide such assistance, and reliance on that adult for such assistance is appropriate under the circumstances.

28 C.F.R. § 36.303(c)(3).  Even if the regulation properly applies here, it is undisputed that Plaintiffs requested that Johnson (and their service dogs) stay with Mullen in her room at Orchard Park for several weeks.  A reasonable juror could find that Plaintiffs' request and Johnson's willingness to interpret for Mullen, even if just for a certain time period or for certain interactions, justify Orchard Park's reliance on Johnson to interpret pursuant to § 36.303(c)(3)(ii).

Finally, Mullen refutes Defendants' arguments that she was provided "equal" treatment. First, Mullen argues that communications between her and Orchard Park staff were actually "unfamiliar and complex."  Mullen points to Medicare regulation 42 C.F.R. § 409.32, which identifies the "criteria for skilled services" and provides: "To be considered a skilled service, the service must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." 42 C.F.R. § 409.32(a).  Mullen also

cites a Rule 30(b)(6) deposition of Orchard Park in which the deponent testified that the facility provided, and accepted Medicare payments for, skilled nursing services, skilled rehabilitation services, physical therapy services, and occupational therapy services.  Reply 20-21 (citing Rule 30(b)(6) Deposition of South Denver Rehabilitation, LLC by Thomas Sylvain, August 21, 2019, 27: 11 – 29: 11, ECF 128-1).  The Court is not convinced that this evidence refutes Defendant's argument regarding *communications*; while the treatment itself is certainly complex necessitating the skills of a healthcare professional, and while some treatment likely requires more complicated communications between provider and patient, it is not clear that *all* communications regarding treatment must be complex.  For example, a nurse might know from her training that a patient needs a certain dosage of medication three times per day; however, she need only provide the medication to the patient at the required times without needing to explain each and every time what it is and why it is needed.  Such interactions are routine and familiar and do not require complex communication skills.  It is for the jury to determine whether an interpreter was "necessary" for communications between Mullen and the providers at Orchard Park.

Second, Mullen argues that Orchard Park cannot "delegate" its responsibility to provide necessary auxiliary aids and services by asserting that doctors unaffiliated with Orchard Park were responsible for treating Mullen's pain.  The Court agrees with Mullen that Orchard Park cannot delegate its legal responsibilities; however, the Court also finds that a jury must determine whether Orchard Park's aids were sufficient to provide effective communication between Mullen and Orchard Park staff concerning treatment of her pain.

Third, Mullen contends "there is no genuine dispute that reliance on Ms. Johnson was ineffective communication and unequal to Ms. Mullen's hearing counterparts."  The Court

disagrees; the undisputed evidence reflects that, prior to her admission, Mullen agreed to have Johnson present to interpret between Mullen and Adair and Plaintiffs requested that Johnson live at the facility for several weeks during which time she interpreted for Mullen.  As set forth above, whether Johnson's interpretation was ineffective and whether Orchard Park's reliance was inappropriate are questions for the jury.

Fourth, Mullen argues that written communications between her and Orchard Park staff was "unequal" and "ineffective."  She points to Orchard Park's new policy as a "concession" that the facility's reliance on handwritten notes is a violation of the law; however, the policy actually lists as an example of a facility providing ineffective communication the "[*i*]*nappropriate* reliance on handwritten notes for individuals whose primary means of communication is ASL."  ECF 79-9 at 3.  This policy accords with 45 C.F.R. § 84.52(d)(1) requiring the provision of "appropriate" auxiliary aids.  As Plaintiffs assert, "the material question is whether Ms. Mullen's marginal ability to read or write in English allows her to communicate with Orchard Park's staff in a manner equal to her hearing counterparts."  Reply 25.  Whether Mullen's ability is "marginal"; whether the handwritten notes were inappropriate; and whether Orchard Park's request for an interpreter during therapy sessions and conferences demonstrates either its acknowledgment of the need for effective communication or its efforts to accommodate Mullen are issues of material fact that are inappropriate for summary judgment.

The Court concludes that only a jury may determine whether Orchard Park violated Mullen's rights under the Rehab Act and ACA and, therefore, Mullen's motion for summary judgment is denied.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment [filed January 10, 2020; ECF 79] is **granted in part** and **denied in part**, and Plaintiffs' Partial Motion for Summary Judgment Against Defendant South Denver Rehabilitation, LLC [filed January 10, 2020; ECF 80] is **denied**.  The second, fourth, sixth, and eighth claims filed by Plaintiff Johnson are dismissed, and she shall be removed as a plaintiff from the case caption.  In addition, Plaintiff Mullen's third and seventh claims are dismissed.  Mullen's first, fifth, and ninth claims against the Defendants for compensatory and punitive (as allowed by law) damages will proceed to trial.

SO ORDERED.

Dated at Denver, Colorado, this 20th day of May, 2020.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge